# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 3, 2014

No. 11-11140

Lyle W. Cayce
Clerk

ART MIDWEST INCORPORATED, a Nevada Corporation; AMERICAN REALTY TRUST INCORPORATED, a Georgia Corporation

Plaintiffs-Intervenor Defendants - Appellants

v.

ATLANTIC LIMITED PARTNERSHIP XII, a Michigan Limited Partnership; REGIONAL PROPERTIES LIMITED PARTNERSHIP, a Michigan Limited Partnership,

Intervenor Plaintiffs - Appellees

v.

DAVID M. CLAPPER; ATLANTIC MIDWEST L.L.C., a Michigan Limited Liability Company; ATLANTIC XIII L.L.C., a Michigan Limited Liability Company,

Defendants - Appellees

Appeal from the United States District Court
for the Northern District of Texas

Before ELROD and HIGGINSON, Circuit Judges, and JACKSON, District Judge.[*]

---

[*] Chief District Judge of the Middle District of Louisiana, sitting by designation.

No. 11-11140

HIGGINSON, Circuit Judge:

The fifteen-year history of this case, arising from the collapse of a real estate transaction, both complicates and clarifies this appeal. It complicates because the record exceeds 10,000 pages, and spans a trial, an appeal, a remand, and a second trial. It clarifies because more than a decade of litigation has narrowed the issues open to us.

One issue in particular dominated the parties' briefs and oral argument: whether the decision by ART Midwest, Inc. and American Reality, Inc. (collectively "Plaintiffs-Appellants" or "ART entities") not to cross-appeal a jury's finding that David Clapper ("Clapper"), Atlantic Midwest LLC, and Atlantic XIII, LLC (collectively "Defendants-Appellees" or "Clapper entities") did not commit fraud prevented them from later raising the same fraud claims. We hold that it did. We also reject, with the exception of a double counting of damages, the ART entities' other claims of error.

## FACTS AND PROCEEDINGS

In 1998, the ART entities agreed to acquire eight apartment complexes from the Clapper entities. The parties structured the deal so that an intermediary, ART Midwest LP (the "Partnership"), would be the nominal buyer of the properties.

The agreement provided that the Partnership could "terminate" the transaction under certain circumstances, including a "title or survey problem."[1] The agreement also provided that, if the ART entities "default[ed] in any of [their] obligations," then "the Partnership shall be deemed to have defaulted" on all of them, and that, "[i]n such case," the Clapper entities "shall have the right . . . to terminate" the agreement.

---

[1] A patchwork of contracts governed the transaction. For ease of reference, we refer to the contracts, collectively, as the "agreement." The parties do not dispute that, under the terms of the agreement, Texas law applies.

2

No. 11-11140

Upon conducting due diligence, the ART entities purported to discover that two of the apartment complexes, Concord East and Country Squire, needed repairs before winter to avoid weather damage. The parties amended the agreement to expedite the transfer of the two properties into the Partnership.

After the Partnership acquired the Concord East and Country Squire properties, but before it secured the remaining properties, the ART entities sent a letter to the Clapper entities purporting to terminate the deal. In the letter, dated March 22, 1999, the ART entities wrote that, on behalf of the Partnership, they "elect[ed] to terminate" the agreement because the Clapper entities "fail[ed] to cure the Partnership's title objection regarding the non-conforming uses relating to" one of the remaining properties. The ART entities wrote that "in keeping with the 'all or nothing' spirit of this transaction, it is our . . . expectation that David Clapper will repurchase the [Concord East and Country Squire] properties."

The Clapper entities responded that they "did not default in any of their obligations," and that the Partnership was "not entitled" to terminate the agreement. They also declined to repurchase the properties.

The ART entities initiated this lawsuit, alleging that Clapper defrauded them by representing that "there were no title problems," and seeking a declaratory judgment that they "properly terminated" the deal. The Clapper entities countersued, alleging that the ART entities breached the agreement by purporting to terminate the deal. A jury found that the ART entities properly terminated the deal, but that the Clapper entities did not commit fraud.

The Clapper entities appealed, among other things, the jury's finding that the ART entities had a right to terminate the deal. *See Notice of Appeal*, No. 04-

No. 11-11140

10010, Docket No. 58, at 6-7 (June 15, 2004).[2] The ART entities did not cross-appeal the jury's adverse fraud finding or otherwise address the issue of fraud.

A panel of this court held that "the legal non-conforming zoning use at issue . . . is neither a violation nor a restriction of record on title," and therefore did "not render the title to the . . . property unmarketable." *Art Midwest, Inc. v. Clapper*, 242 F. App'x 130, 132 (5th Cir. 2007) (per curiam). The panel concluded: "Because there was no failure to tender marketable title, there was no default by the [Clapper entities]. It follows that a determination of liability and damages must be decided anew." *Id*.

On remand, the district court granted, in part, summary judgment for the Clapper entities, holding that the ART entities defaulted on the agreement by wrongfully terminating the transaction in their March 22, 1999 letter. The district court also held, among other things, that the mandate rule—that is, the rule that "bars litigation of issues decided by the district court but foregone on appeal or otherwise waived, for example because they were not raised in the district court," *United States v. Lee*, 358 F.3d 315, 321 (5th Cir. 2004)—prevented the ART entities from asserting claims of fraud against the Clapper entities. In a separate summary judgment order, the district court held, among other things, that, by defaulting on the deal, the ART entities owed capital contributions to the Partnership under section 4.02(d) of the agreement.[3]

---

[2] The Clapper entities noted that they "do not claim an appeal from those portions of the Court's Instruction to the Jury/the Jury Verdict related to Question 1-Fraud [and] Question 2-Fraud damages." *Notice of Appeal*, No. 04-10010, Docket No. 58, at 7.

[3] Section 4.02(d) provides:

Annual Appraisal. Commencing on the second anniversary of the Final Effective Date, the Managing General Partner shall obtain an appraisal of the Property (in accordance with Section 10.02(c)) on an annual basis, and if the appraised value of the Property is less than the sum of (i) all outstanding liens on the Property and other Partnership indebtedness plus (ii) the Outstanding Class A Limited Partnership Unit Equity then outstanding, ART shall contribute additional assets, whose value will be determined by appraisal as provided in

No. 11-11140

After this court denied interlocutory review, the district court put the remaining issues—including whether the ART entities owed and breached a fiduciary duty to the Clapper entities, and the amount of damages owed by the ART entities—before a jury.

The jury found in a special verdict that the ART entities owed and breached fiduciary duties to the Clapper Entities. The jury also found that, by defaulting on the agreement, the ART entities owed the Partnership capital contributions of $7.4 million as of February 1, 2001 and $10.6 million as of February 1, 2002. The district court combined the $10.6 million and $7.4 million amounts and, accounting for interest, awarded "Atlantic Midwest, on behalf of the Partnership," $34.4 million. After accounting for additional damages and interest, the total award exceeded $50 million. The ART entities appeal.

## ANALYSIS

### 1. The Fraud Claims

The district court found that it "is undisputed that the jury found against the ART Entities on their independent fraud claims—a result which neither party appealed and which, therefore, remains decided against the ART Entities." The district court therefore found that the ART entities "waived [the issue of fraud] by failing to cross-appeal the jury's rejection of their fraud claims."[4] The

---

Section 10.02(c), to the Partnership such that the value of all assets of the Partnership equal or exceed the sum of (i) all outstanding liens on the Property and other partnership indebtedness plus (ii) the Outstanding Class A Limited Partnership Unit Equity then outstanding. Any amounts so contributed shall be deemed an Additional Capital Contribution to the Partnership by ART.

[4] The district court also found that the ART entities waived these "additional fraud-based justifications for backing out of the deal" because they "failed to advance them at any time before in this case's lengthy history." To the extent the ART entities attempted to raise "*additional* fraud-based justifications for backing out of the deal," (emphasis added), we agree that they waived these claims by not raising them in the first district court proceeding. *See Lee*, 358 F.3d at 321 (noting that the mandate rule "bars litigation of issues decided by the district court but foregone on appeal *or otherwise waived, for example because they were not*

5

No. 11-11140

ART entities now argue that "[t]here was no need to appeal their affirmative defense of fraud" because they "won at the first trial on their breach of contract claims." The parties agree that we review *de novo* the district court's decision not to consider the ART entities' fraud claims on remand.

**(A) The Cross-Appeal Rule**

"[T]his circuit follows the general rule that, in the absence of a cross-appeal, an appellate court has no jurisdiction to modify a judgment so as to enlarge the rights of the appellee or diminish the rights of the appellant." *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 250 (5th Cir. 2010) (alteration in original) (quoting *Borrego Springs Bank, N.A. v. Skuna River Lumber, L.L.C.* (*In re Skuna River Lumber, L.L.C.*), 564 F.3d 353, 356 (5th Cir. 2009)); *see Greenlaw v. United States*, 554 U.S. 237, 244-45 (2008) ("This Court, from its earliest years, has recognized that it takes a cross-appeal to justify a remedy in favor of an appellee."). Even a "party who prevails in the district court is permitted to conditionally raise issues in a cross-appeal because if the appellate court decides to vacate or modify the trial court's judgment, the judgment may become adverse to the cross-appellant's interest." *Cook v. Rockwell Int'l Corp.*, 618 F.3d 1127, 1153 (10th Cir. 2010); *see Council 31, Am. Fed'n of State, Cnty. & Mun. Employees, AFL-CIO v. Ward*, 978 F.2d 373, 380 (7th Cir. 1992) ("This court . . . together with most of the other circuits, treats conditional cross-appeals differently from unconditional appeals. Nominally prevailing parties are entitled to file such cross-appeals against the contingency that this court will reverse an otherwise thoroughly satisfactory judgment."); *Warfield v. Alaniz*, 569 F.3d 1015, 1019 n.3 (9th Cir. 2009) ("A protective cross-appeal is permissible once an initial appeal is filed, raising the possibility of reversal."). This "inveterate and certain" cross-appeal rule, *Morley Constr. Co.*

---

*raised in the district court*") (emphasis added) (internal citations omitted). As discussed below, however, we find that the ART entities' fraud allegations were the same in each proceeding.

No. 11-11140

*v. Md. Cas. Co.*, 300 U.S. 185, 191 (1937), is "meant to protect institutional interests in the orderly functioning of the judicial system, by putting opposing parties and appellate courts on notice of the issues to be litigated and encouraging repose of those that are not." *El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 481-82 (1999).

The parties do not identify, and we could not find, a case in which this court has addressed whether a party that declines to cross-appeal an adverse ruling in an initial district court proceeding may raise the claim on remand from the resulting appeal. However, other circuit courts have found that "[i]t is elementary that where an argument could have been raised on an initial appeal, it is inappropriate to consider that argument on a second appeal following remand." *Nw. Ind. Tel. Co. v. F.C.C.*, 872 F.2d 465, 470 (D.C. Cir. 1989) ("This widely-accepted rule furthers the important value of procedural efficiency . . . ."); *see Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 739 (D.C. Cir. 1995) ("We have several times said that appellate courts are precluded from revisiting not just prior *appellate* decision but also those prior rulings of the *trial* court that could have been but were not challenged on an earlier appeal."); *Munoz v. Cnty. of Imperial*, 667 F.2d 811, 817 (9th Cir. 1982) ("We need not and do not consider a new contention that could have been but was not raised on the prior appeal."); *Fogel v. Chestnutt*, 668 F.2d 100, 109 (2d Cir. 1981) ("It would be absurd that a party who has chosen not to argue a point on a first appeal should stand better as regards the law of the case than one who had argued and lost."); *Kessler v. Nat'l Enters., Inc.*, 203 F.3d 1058, 1059 (8th Cir. 2000) ("The general rule is that, where an argument could have been raised on appeal, it is inappropriate to consider that argument on a second appeal following remand.") (internal quotation marks omitted).[5]

---

[5] There is uncertainty as to whether the cross-appeal requirement is a subset of the law-of-the-case doctrine or an application of waiver doctrine. *See, e.g.*, *Crocker*, 49 F.3d at 739-

No. 11-11140

We hold that the ART entities' decision not to cross-appeal the jury's fraud findings in the first district court proceeding prevented them from raising the same rejected fraud claims in the second district court proceeding. Even though they prevailed on many of their claims in the first district court proceeding, the consensus of circuit authority supports that the ART entities could have filed a "protective" or "conditional" cross-appeal of the adverse fraud finding. *See Cook*, 618 F.3d at 1153; *Ward*, 978 F.2d at 380; *Warfield*, 569 F.3d at 1019 n.3. The consensus of circuit authority also supports that, by not cross-appealing the fraud finding, the ART entities could not raise the same fraud claims on remand. *See Nw. Ind. Tel.*, 872 F.2d at 470; *Crocker*, 49 F.3d at 739; *Munoz*, 667 F.2d at 817; *Fogel*, 668 F.2d at 109; *Kessler*, 203 F.3d at 1059. The issue therefore narrows to whether the ART entities raised the "same" fraud claims. Our comparison of the ART entities' complaints in the first and second district court proceedings indicates that they alleged the same fraud claims—that Clapper misrepresented a nonconforming zoning use as to one of the remaining properties—in each proceeding. The ART entities acknowledged as much in their briefs, noting that, on remand, they "sought to pursue fraud claims and defenses that *have been alleged since this case began*" (emphasis added).[6] This acknowledgment, coupled with the language in the complaints, supports that the fraud claims advanced by the ART entities on remand were within the scope of, and therefore decided by, the jury's adverse fraud finding. Accordingly, the ART entities did not satisfy the cross-appeal rule.

The ART entities imply that the panel's "liability and damages must be decided anew" language overrode any cross-appeal requirement, and compelled

---

40. We need not resolve this uncertainty to decide this appeal.

[6] As discussed above, to the extent the ART entities raised *new* fraud claims on remand, they waived these claims by not raising them in the first district court proceeding. *See Lee*, 358 F.3d at 321.

the district court on remand to consider their fraud claims "anew" under the mandate rule. However, we first must determine whether the cross-appeal rule is "'jurisdictional,' and therefore exceptionless, or a 'rule of practice,' and thus potentially subject to judicially created exception." *Greenlaw*, 554 U.S. at 245.[7] Although the circuits have split on this issue, *compare, e.g.*, *Johnson v. Teamsters Local* 559, 102 F.3d 21, 28 (1st Cir. 1996) (noting that the cross-appeal rule "is mandatory and jurisdictional") (internal quotation marks omitted) *with Kessler*, 203 F.3d at 1059 (noting that the rule is "prudential, not jurisdictional"), and the Supreme Court has "declined to decide the 'theoretical status' of the cross-appeal rule," *Greenlaw*, 554 U.S. at 245; *see Neztsosie*, 526 U.S. at 480, this circuit has characterized the cross-appeal rule as "jurisdiction[al]." *Amazing Spaces*, 608 F.3d at 250. This "jurisdiction[al]" characterization prevents us from deciding whether the panel's "decide[ ] anew" language warrants an exception to the rule.

We note that, even if we could consider this argument, we would not exercise discretion to allow the ART entities to pursue their fraud claims on remand. "The mandate rule requires a district court on remand to effect our mandate and to do nothing else." *Gen. Universal Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 453 (5th Cir. 2007) (quoting *United States v. Castillo*, 179 F.3d 321, 329 (5th Cir. 1999), *rev'd on other grounds*, 530 U.S. 120 (2000)). Although the panel's "decide[ ] anew" language is broad, in interpreting this language, we must "tak[e] into account the appellate court's opinion and the circumstances it embraces." *Lee*, 358 F.3d at 321 (alteration in original) (quoting *Sobley v. S. Natural Gas Co.*, 302 F.3d 325, 333 (5th Cir. 2002)). The ART entities did not raise their fraud claims on initial appeal, and the panel opinion did not address the issue of fraud. *See Art Midwest*, 242 F. App'x at 130-32. These

---

[7] Although the parties do not brief this issue, "[w]e have jurisdiction to determine our own jurisdiction." *Martin v. Halliburton*, 618 F.3d 476, 481 (5th Cir. 2010).

"circumstances" indicate that the panel required the district court to "decide[ ] anew" only issues *implicated* by its holding that Clapper tendered marketable title. Yet the panel's marketable title holding did not implicate, but instead *reinforced*, the jury's finding that Clapper did not defraud the ART entities by misrepresenting title. Thus, the "decide[ ] anew" language did not require the district court to consider the ART entities' fraud claims. *See Lee*, 358 F.3d at 321.

In sum, we hold that the district court did not err in finding that the ART entities' decision not to cross-appeal the jury's adverse fraud findings in the first district court proceeding prevented them from raising the same rejected fraud claims in the second district court proceeding.

**2. The Damages Calculation**

On remand, the district court held that, by purporting to terminate the deal in a March 22, 1999 letter, the ART entities defaulted under the agreement. The district court also found that, by defaulting, the ART entities violated section 4.02(d) of the agreement, and owed "capital contributions" to the Partnership. The district court instructed the jury in its Question No. 5 charge to determine the amount of contributions owed as of February 1, 2001 and February 1, 2002. The jury found that, as of February 1, 2001, the ART entities owed $7.4 million, and that, as of February 1, 2002, the ART entities owed $10.6 million. The district court then combined the amounts, awarding "Atlantic Midwest, on behalf of the Partnership" almost $18 million before interest. The ART entities challenged the district court's decision to combine the amounts in post-judgment motions. The district court denied the motions. The ART entities renew their argument that the $7.4 million and $10.6 million amounts "are not independent of each other—the contribution amount as of February 2002 includes the February 2001 contribution amount." The ART entities maintain, and the Clapper entities do not dispute, that "[t]he calculation of damages in the form of contributions under section 4.02(d) of the Partnership Agreement is an

No. 11-11140

interpretation of contract issue," and that, therefore, *de novo* review applies. *See Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004) (per curiam).

We agree that the amounts overlap. The district court wrote in its September 2009 summary judgment order: "[I]t is not clear from the summary judgment record whether the amount claimed for 2002 . . . is cumulative and assumes the amount claimed for 2001 . . . was never paid. If so, awarding both would be double counting." The parties do not identify, and we could not find, further explanation by the district court as to why, if it had concerns that the 2001 and 2002 totals overlapped, it nonetheless decided to combine the amounts.[8] However, demand letters sent by Clapper entities in 2001 and 2002, which correspond to the jury's contribution amount findings, validate the district court's initial concerns about "double counting." The 2001 letter demanded that the ART entities contribute $7.4 million to the Partnership. The letter indicates, and accompanying documents confirm, that this $7.4 million figure comprised, in part, accounts payable of $861,000, and loans payable of $5.4 million. The 2002 letter demanded that the ART entities contribute $10.6 million to the Partnership. The letter indicates that this $10.6 million figure comprised, in part, accounts payable of $1.2 million and loans payable of $9.8 million, which were then reduced by the value of the property. Although only some of the accompanying documents are legible, they suggest that this increase resulted from interest payments that had accrued in the past year. Thus, the letters and

---

[8] The Clapper entities maintained at oral argument that the district court explained its decision to combine in an October 7, 2011 order. We could not identify in the record an order dated October 7, 2011. To the extent the Clapper entities meant to refer to the district court's October 11, 2011 order awarding damages, we also could not identify in that order an explanation by the district court as to why it combined the amounts. Although the district court wrote that it was "sensitive to ART's argument that these sums are a windfall and detached from the economic realities underlying the transaction," it did so in reference to the 19% prejudgment interest rate levied on the contribution amounts, *not* the decision to combine the amounts.

11

accompanying documents indicate that the $10.6 million total *encompassed*, and was not *independent* of, the $7.4 million amount.

The Clapper entities confirmed that the amounts overlapped in district court and at oral argument. The Clapper entities told the jury in their closing argument: "[Y]ou will determine the amount as of [the 2001] date and you will determine the amount as of the 2002 date. *That doesn't mean that we are getting both*. . . . The Court . . . will . . . sort out as a matter of law . . . which amounts overlap or don't overlap . . . ." (emphasis added). The Clapper entities then acknowledged at oral argument that "certain elements, particularly with respect to the two [demand] notes . . . are the same," and that the "2002 numbers would encompass, because it was cumulative . . . the ones from 2001."[9] Thus, by the Clapper entities' acknowledgment, the amounts overlapped.

In sum, because the contribution amounts overlap, and because the parties neither identify language in the agreement nor an explanation from the district court supporting this double counting of damages, we hold that the district court's decision to combine the amounts was in error. We therefore VACATE the combined award, and REMAND so that the district court can decide whether the 2001 or 2002 amount is the appropriate measure of damages, and then, taking into account interest, recalculate the award.[10]

---

[9] At oral argument, counsel for the Clapper entities was commendably candid responding to inquiry: "If we take away your damages to take them down to 10.5$ million, you can't really object to that, can you?" Counsel forthrightly answered: "If this appeal concluded at this point . . . we would not pursue the issue further."

[10] The ART entities also argued that the Question No. 5 charge was defective because "it requested the contribution amount from an incorrect point in time." However, the ART entities do not argue, and the record does not support, that they challenged the Question No. 5 charge in district court. "[W]here no timely objection is made to a jury instruction, the claimed error cannot be reviewed on appeal unless giving the instruction was 'plain error' so fundamental as to result in a miscarriage of justice." *Middleton v. Harris Press & Shear, Inc.*, 796 F.2d 747, 749 (5th Cir. 1986). We find that the district court did not plainly err by giving the instruction because the charge did not ask the jury to aggregate the amounts, only to assess them.

No. 11-11140

## 3. Miscellaneous Issues

The ART entities advance additional claims of error.  Because we find that these claims are ancillary to the crux of the ART entities' appeal and also unavailing, we have grouped them in this section.[11]

### (A) The Guarantee of the Deposit Notes

The parties agreed that the ART entities would pay $5.5 million to facilitate the transaction: a $500,000 cash deposit, which was placed in escrow; an initial $2 million promissory note to Clapper; and an additional $3 million promissory note to Clapper in exchange for Clapper extending the deal's closing date.  The district court found that, by defaulting on the agreement, the ART entities breached their guaranty of the deposit notes. The ART entities argue that it was instead the Partnership, a separate legal entity, that guaranteed the notes.

We find that the ART entities waived the argument that they did not guarantee the notes by not raising the issue in district court.  The Clapper entities wrote in an October 2007 motion for summary judgment that the ART entities guaranteed the notes. The parties do not identify, and we could not find, record evidence showing that the ART entities disputed this characterization or otherwise argued in district court that they did not guarantee the notes. Further, the ART entities acknowledged in their brief in the first appeal that: "As the parties worked toward closing the remaining properties, the Partnership provided certain deposit notes and extension notes . . . to Defendants, totaling $5 million. . . . *ART guaranteed these notes*" (emphasis added).  Thus, because "this court cannot decide disputed issues of material fact," and because the ART entities "faile[d] to set forth specific facts, by affidavits or otherwise, to show

---

[11] With the exception of the ART entities' challenges to the jury's fiduciary duty findings and the Question No. 5 Instruction, we review the following issues of contract interpretation *de novo*. *See Gonzalez*, 394 F.3d at 392.

No. 11-11140

there is a genuine issue for trial," *Topalian v. Ehrman*, 954 F.2d 1125, 1131-32 (5th Cir. 1992), they waived the argument that they did not guarantee the notes.

**(B) The Partnership's Dissolution Date**

The agreement provides that "the Partnership shall be dissolved upon . . . [t]he passage of 90 days after the sale or other disposition (other than an exchange), in either case for cash, of all or substantially all of the assets of the Partnership." In the first proceeding, the district court found that the ART entities' March 22, 1999 letter purporting to terminate the deal dissolved the Partnership. On remand, the district court found that the Partnership instead dissolved on May 20, 2002. The ART entities argue that the district court's initial March 22, 1999 finding was correct.

We find that the plain language of the agreement supports the district court's finding that the Partnership dissolved on May 20, 2002. The agreement provides that "the Partnership shall be dissolved" ninety days after the "disposition . . . of all or substantially all of the assets of the Partnership." Merriam-Webster defines "dispose" to mean "transfer or part with, as by selling." MERRIAM-WEBSTER'S II NEW RIVERSIDE DICTIONARY 202 (rev. ed. 1996). The district court found that "all or substantially all Partnership assets were disposed of as a result of the consent judgment and decree of foreclosure" entered by a state court on February 19, 2002. The ART entities do not dispute that this decree of foreclosure, which provided that "any person who may be in possession of the Real Estate . . . shall forthwith surrender the Real Estate," removed "all Partnership assets." Because the ART entities do not dispute that the Partnership did not "part with" its assets until the February 19, 2002 foreclosure decree, and because the plain language of the agreement provides that the Partnership shall be dissolved ninety days after the Partnership parts with its assets, the district court did not err in finding that the Partnership dissolved ninety days after the foreclosure decree, or May 20, 2002.

14

No. 11-11140

The ART entities argue that the district court's initial March 22, 1999 dissolution date finding bound the district court on remand. However, the district court based this finding on its conclusion that the ART entities' March 22, 1999 letter terminated the deal. The panel's holding that the Clapper entities tendered marketable title implicated the district court's initial March 22, 1999 dissolution date finding—the ART entities could not terminate the deal through a letter claiming that title was bad if title was in fact marketable—and required the district court to decide the Partnership's dissolution date anew.[12]

The ART entities also argue that a "Certificate of Cancellation" filed with the Texas secretary of state, confirms under the Texas Revised Limited Partnership Act ("TRLPA") that the Partnership dissolved on March, 22, 1999. Although a certificate of cancellation can cancel a partnership, *see* TEX. REV. CIV. STAT. ANN. art. 6132a-1 (West 2006), the plain language of the agreement, and not the TRLPA, controls. *See* TEX. REV. CIV. STAT. ANN. art. 6132b § 8.01(c)(2) ("In a partnership in which the partnership agreement provides for winding up on a specified event, winding up is required on . . . the occurrence of the specific event . . . ."). As discussed above, this plain language supports that the Partnership dissolved on May 20, 2002.[13]

Finally, the ART entities argue that the district court's May 20, 2002 dissolution date finding "revived a Partnership that has, for all intents and purposes, been dead for nearly a decade" in violation of the equitable mootness doctrine. The equitable mootness doctrine is a "recognition by the appellate

---

[12] The ART entities argue that it was inconsistent for the district court to treat the jury's fraud verdict as binding while deciding the dissolution date anew. As discussed above, however, the panel's holding implicated the district court's dissolution date finding; it did not implicate, but rather reinforced, the jury's fraud verdict.

[13] Even if the plain language of the agreement did not control, the ART entities do not dispute the district court's finding that the certificate was "filed without authority and was ineffective to terminate the Partnership."

15

courts that there is a point beyond which they cannot order fundamental changes in reorganization actions." *Manges v. Seattle-First Nat'l Bank (In re Manges)*, 29 F.3d 1034, 1039 (5th Cir. 1994).  However, courts "have employed the concept of 'mootness' to address equitable concerns unique to bankruptcy proceedings." *Id*. at 1038.  The ART entities do not identify a persuasive reason to apply this bankruptcy-specific doctrine to this case.  Thus, the district court's May 20, 2002 dissolution date finding did not violate the equitable mootness doctrine.

**(C) The Fiduciary Duty Verdict**

The mortgage on the Country Squire property was held by Inland Mortgage Corp. ("Inland").   After the deal collapsed, Inland obtained a foreclosure decree, and the Country Squire property was sold to TacCo Falcon Point, Inc.  The Clapper entities argued in district court that the ART entities "breached the fiduciary duties they owed [as] partners" by using TacCo to obtain the property.  The jury found in a special verdict that the ART entities owed, and breached, a fiduciary duty to the Clapper entities.  The ART entities do not dispute, and Texas law supports, *see Fitz-Gerald v. Hull*, 237 S.W.2d 256, 264 (Tex. 1951), that, as partners, the ART entities owed a fiduciary duty to the Clapper entities.  Instead, the ART entities contend that they did not breach this duty because "[t]here was no evidence at trial that ART or ART Midwest obtained the Country Squire property" through TacCo. We "will reverse" the jury's breach of fiduciary duty finding "only if no reasonable jury could have arrived at the verdict." *Miss. Chem. Corp. v. Dresser-Rand Co.*, 287 F.3d 359, 365 (5th Cir. 2002) (internal quotation marks omitted).

We find that a reasonable jury could have determined that the ART entities breached the fiduciary duty it owed the Clapper entities.  The Clapper entities introduced into evidence a state court judgment, affirmed by a state appellate court, finding that the ART entities used TacCo as their "strawman"

to buy the Country Squire property. The Clapper entities also introduced testimony that confirmed details underlying the state judgment. This testimony, coupled with the state court judgment, provided sufficient evidence to support a "reasonable jury's" finding that the ART entities breached fiduciary duties owed to the Clapper entities by using a "strawman" to acquire the Country Squire property.

**(D) Section 4.02(d)**

Finally, the ART entities advance three arguments relating to section 4.02(d) of the agreement.

*(i) Standing*

The ART entities argue that the Clapper entities lacked standing to "bring a claim for loss of Partnership property" under section 4.02(d). However, "a partner may individually sue for the benefit of the partnership and other partners." *R & R White Family Ltd. P'ship v. Jones*, 182 S.W.3d 454, 458 (Tex. App.—Texarkana 2006, no pet.). The parties do not dispute that Atlantic Midwest, a Clapper entity, was a partner, and the record indicates that, since the inception of this case, Atlantic Midwest has argued that the ART entities owed contributions to the Partnership under section 4.02(d). Thus, the Clapper entities "sue[d] for the benefit of the partnership and other partners," *see Jones*, 182 S.W.3d at 458, and therefore have standing.

*(ii) The Appraisal Requirement*

Section 4.02(d) provides that "the Managing General Partner"—as discussed above, Clapper entity Atlantic Midwest—"shall obtain an appraisal of the Property . . . on an annual basis." The district court found that, by sending the March 22, 1999 letter purporting to terminate the deal, the ART entities defaulted on the agreement, thereby excusing Atlantic Midwest from obtaining the annual appraisal. The ART entities argue that the Clapper entities violated section 4.02(d) by not conducting the appraisal.

No. 11-11140

To the extent that the ART entities preserved the issue,[14] we find that the ART entities' default excused Atlantic Midwest from conducting an appraisal. The ART entities defaulted on the agreement on March 22, 1999, and section 4.02(d) did not obligate the Clapper entities' to conduct an appraisal until February 1, 2002. Because the ART entities defaulted on the agreement two years before the Clapper entities were obligated to perform the appraisal, and because a "[d]efault by one party excuses performance by the other party," *Mead v. Johnson Grp., Inc.*, 615 S.W.2d 685, 689 (Tex. 1981), the ART entities' default excused the Clapper entities from conducting the appraisal.

*(iii) The Concord East Loan*

After the deal collapsed, the Concord East property was sold for $1.5 million. The ART entities argue that "[n]o part of the sales proceeds was applied to reduce the underlying debt on the Concord East apartments."[15]

We find that proceeds from the sale were applied to reduce the underlying debt. Accountant Thomas Frazee, a Clapper entities expert, testified that the contribution amount owed by the ART entities was "reduced for the fact that the [Concord East] property was sold and roughly a million dollars was taken and applied against that note." Clapper testified that "a portion of the sales price was credited against the note." The ART entities do not persuasively rebut this testimony. Thus, we cannot say that "[n]o" proceeds from the sale were applied to reduce the debt.

---

[14] The parties submitted cross-motions for summary judgment as to liability under section 4.02(d). The district court granted summary judgment for the Clapper entities on the basis that the ART entities breached section 4.02(d). Then, at trial, the ART entities argued that the Clapper entities' failure to obtain an appraisal excused their breach of section 4.02(d). The district court found that the ART entities waived this appraisal argument by not raising it at the summary judgment stage.

[15] The ART entities also note that they "paid the Inland loan in full." However, the district court's judgment took this into consideration.

No. 11-11140

The ART entities also argue that the Concord East loan was non-recourse—that is, a loan in which "the maker does not personally guarantee repayment of the note and will, thus, have no personal liability," *Fein v. R.P.H., Inc.*, 68 S.W.3d 260, 266 (Tex. App.—Houston [14th Dist.] 2002, pet. denied)—and that, therefore, the sale of the property "full satisfied" the loan. However, an amendment to the agreement provided that "[t]he Partnership shall assume at Closing, *with full recourse*, the *First Lien Loans*," (emphases added), and Thomas Popplewell, an expert for the ART entities, explained that"the [Concord East] loan . . . is a first lien loan" that "would be binding on the partnership." Thus, because the amendment provided that the Concord East loan was a recourse obligation, the sale of the property did not "full[y] satisf[y]" the obligation.

## CONCLUSION

Accordingly, we VACATE the award of combined contribution amounts, and REMAND for further proceedings consistent with this opinion. We otherwise AFFIRM.