EATON, Judge:
Delma Jackson brought this civil rights action under 42 U.S.C. § 1983 alleging that the termination of her visitation privileges with her inmate husband was in retaliation for exercising her free speech rights under the First Amendment. Mrs. Jackson maintains that three Georgia Department of Corrections officials, prison warden Carl Humphrey, director of facilities Randy Tillman, and assistant commissioner Timothy Ward (the “Corrections officials”), terminated her visitation privileges as a consequence of her public protests of claimed constitutional violations committed by the Department of Corrections against her husband and other inmates. The District Court found that the Corrections officials were entitled to the protections of qualified immunity while her husband and the other inmates were engaged in a hunger strike, but not thereafter.
The Corrections officials now appeal the District Court’s ruling, to the extent that it denied them summary judgment after the inmate’s hunger strike ended, arguing that they enjoyed qualified immunity from suit for that period. We agree, reverse, and remand to the District Court to enter judgment in the Corrections officials’ favor.
I.
In June 2012, Mrs. Jackson’s husband, Miguel Jackson, was confined to the Georgia Diagnostic and Classification Prison’s Special Management Unit for maximum security inmates.[1] The three Corrections officials are all employees of the Georgia Department of Corrections, located in Jackson, Georgia.
On about June 10, 2012, Mr. Jackson began refusing meals and shortly thereafter was deemed to be on a hunger strike.[2] *1235 Five other inmates soon joined him. The Corrections officials believed that Mr. Jackson encouraged the other inmates to refuse their meals, based on his statement to Warden Humphrey that he was the leader of the hunger strike. In addition, Mr. Jackson testified at his deposition that he told other inmates that he was refusing food, and that his nickname was “Chief’ because he had “a lot of influence” over the inmates. This claim, that Mr. Jackson was the leader of the hunger strike, was confirmed by other inmates.
On June 13, 2012, Warden Humphrey instructed the Department of Corrections staff to regularly monitor the striking inmates, which required that they be brought to the prison’s medical unit each day to be weighed and have their vital signs measured. Two days later, Warden Humphrey met with each of these inmates individually, after which he informed Director Tillman that the inmates were on a hunger strike. On June 22, 2012, Mr. Jackson and another inmate refused measurement of their ketone and blood sugar levels.
Mrs. Jackson visited her husband at the prison over the weekend of June 28 and June 24, 2012. The following week, as the hunger strike persisted, Warden Humphrey directed his staff to suspend all visitation privileges,[3] aside from attorney visits, for each inmate participating in the strike. According to Warden Humphrey’s affidavit, these inmates’ visitation privileges were suspended for safety and security reasons, to avoid compromising the inmates’ health, and to limit outside communication in an effort to contain the spread of the strike. Among other things, Warden Humphrey was concerned that the Special Management Unit was unable to provide adequate security coverage and medical monitoring for the striking inmates.
On July 2, the striking inmates were moved to a secured area where they could be more closely monitored with regular checks by officers and nurses. Additional correctional officers were detailed, for security purposes, to escort the striking inmates to the medical unit. Warden Humphrey was also informed by medical staff that, if the hunger strike persisted, inmates would need to be housed in the infirmary, even though it was not equipped to hold maximum security inmates, so that they could receive intravenous injections and twenty-four-hour medical care.
Record evidence indicates that Director Tillman and Assistant Commissioner Ward read a June 26 report that made them aware that Mrs. Jackson had publicly criticized the Department of Corrections’ treatment of her husband and other inmates housed in the Special Management Unit. On that day, while being examined at the medical unit by a doctor and nurse, and in response to being asked why he was refusing to eat, it was reported to Warden Humphrey and Director Tillman that Mr. *1236 Jackson stated “just watch the news Friday [June 29] between 12 & 2 and you will find out.”
By June 27, 2012, five inmates, including Mr. Jackson, remained on strike. Three additional inmates stopped eating that day, and Mr. Jackson and another inmate refused to go to the prison’s medical unit. On June 28, 2012, two of the striking inmates refused measurement of their blood sugar and ketone levels, and a third inmate joined Mr. Jackson and another inmate in refusing to visit the Special Management Unit’s medical facility.
Shortly after the hunger strike began, prison officials began opening and reading Mr. Jackson’s mail. On June 28, 2012, Warden Humphrey forwarded a letter to Director Tillman that mentioned a rally planned for June 29 and that referenced the possibility that inmates at Augusta State Prison might begin striking as wéll. On that same day, another internal report indicated that there were rumors that the hunger strike would spread to another wing of the Special Management Unit and to Macon State Prison, and that the inmates in that other wing were also “planning to attempt to disrupt the operations of the facility by resisting on the tray flaps, refusing to come off the recreation call, complaining of chest pains, etc.”
On Friday, June 29, 2012, Mrs. Jackson led a public protest at the Georgia State Capitol seeking to build awareness about the prison’s conditions:[4] The record demonstrates that the Corrections officials received an e-mail later that day about the demonstration, which noted that Mrs. Jackson “gave testimony to the assembled group.” On July 2, 2012, Warden Humphrey ordered the striking inmates to be moved to climate-controlled cells, and arranged for twenty-four-hour on-hand nursing staff and visual checks of each inmate at fifteen-minute intervals. On July 5, 2012, two more inmates joined the hunger strike and a third inmate missed his ninth straight meal, raising the total of striking inmates to eleven. The next day, Warden Humphrey met individually with each of the striking inmates. At the end of the meetings, each inmate, including Mr. Jackson, accepted a sack lunch. As a result, Warden Humphrey believed that the hunger strike was over and visitation privileges were restored to all striking inmates.
Mrs. Jackson visited with her husband over the weekend of July 7 and 8, 2012. On Monday, July 9, Warden Humphrey was informed that eight inmates, including Mr. Jackson, had refused all three of their meals that day. With the exception of attorney visits, visitation for each of these inmates was suspended. Also on July 9, Mrs. Jackson spoke at a second rally at the State Capitol. Warden Humphrey was informed that Mr. Jackson was the only one of the striking inmates who had received visitors during the preceding weekend, and forwarded this information to Director Tillman. Warden Humphrey also provided Director Tillman with a report that included an internet link to a news article discussing Mrs. Jackson’s July 9 protest, and Warden Humphrey suggested that the protest “may be the reason the inmates continued the strike” and that the timing of Mrs. Jackson’s weekend visit was significant.
On July 12, 2012, Director Tillman and Assistant Commissioner Ward received an e-mail detailing a recorded telephone call *1237 made that day by an inmate named Dexter Shaw. According to the e-mail, Mr. Shaw was recorded as saying that Mrs. Jackson had “allegedly told [Mr.] Jackson to keep the hunger strike going for ten more days until July 18” until she received written guarantees from the Governor of Georgia, with whom she sought a meeting, and from the Department of Corrections commissioner, that conditions at the prison would change.
On July 16, 2012, Mrs. Jackson spoke at a public demonstration at the Department of Corrections’ headquarters. Both Warden Humphrey and Director Tillman were aware that she spoke at the demonstration. Following a meeting on July 18, 2012, Assistant Commissioner Ward ordered Warden Humphrey to revoke Mr. Jackson’s visitation privileges with his wife. Although visitation for all striking inmates was already suspended, letters were sent to Mr. and Mrs. Jackson on July 19, 2012, informing them that Mrs. Jackson’s visitation privileges were terminated.[5]
According to Warden Humphrey, at the time the letters were sent, he and Assistant Commissioner Ward believed that the strike “was significantly disrupting the operation of the facility and jeopardizing the security and safety of staff and inmates.” This belief was based, in part, on the Special Management Unit’s inability to provide adequate security and medical assistance for the striking inmates, the additional staffing requirements that the strike demanded of the prison, and the health of those inmates refusing meals. Moreover, for the Corrections officials, the timing of Mrs. Jackson’s visits with her husband after he had accepted food on July 6, and the resumption of the hunger strike immediately following her visits over the weekend of July 7 and 8, was a significant factor in their decision to terminate Mrs. Jackson’s visitation privileges.
Mr. Jackson continued to strike until July 26, 2012, when he requested food, and the strike ended. His visitation privileges were restored, aside from those with his wife. Notably, Janice Jackson, Mr. Jackson’s mother, who also participated in the June and July 2012 protests, including the July 16 protest at the Department of Corrections’ headquarters, did not have her visitation privileges terminated and has been able to visit with Mr. Jackson.
Assistant Commissioner Ward stated that a reason for removing Mrs. Jackson from the visitation list was because the Corrections officials believed that she was influencing the hunger strike by encouraging her husband to prolong the strike. In addition, Assistant Commissioner Ward believed that Mrs. Jackson was the “conduit” or “avenue” through which her husband was “able to communicate disruptive actions and behaviors to incite others either inside or outside” the prison.
Thus, the Corrections officials were motivated to terminate Mrs. Jackson’s visitation privileges by the hope that this would prevent her from continuing to encourage the prolongation of the hunger strike and prevent her from inciting disruptive behavior in other inmates within the prison, who *1238 were not housed in her husband’s Special Management Unit, and in inmates housed at other state prison facilities.
Nonetheless, Assistant Commissioner Ward did not deny that Mrs. Jackson’s participation in a protest without a permit and her demands for a meeting with the Department of Corrections commissioner were also factors in the Corrections officials’ decision to terminate Mrs. Jackson’s visitation privileges. Thus, the decision to terminate Mrs. Jackson’s visitation privileges was also motivated, at least in part, by a desire to silence her.
On January 8, 2014, the District Court awarded summary judgment, based on qualified immunity, in favor of the Corrections officials, for their decision to terminate Mrs. Jackson’s visitation privileges during the time of the hunger strike. The District Court, however, denied the Corrections officials summary judgment for the period following the end of the hunger strike and found that the question of whether the Corrections officials continued to enjoy qualified immunity post-hunger strike was one for a jury. The Corrections officials appealed to this Court, contending that the District Court erred in denying them qualified immunity for their actions in terminating Mrs. Jackson’s visitation privileges with her husband.
II.
We properly have “jurisdiction to hear this interlocutory appeal of the denial of qualified immunity as the issue involves the determination of whether the official[s’] conduct violated clearly established law.” Sherrod v. Johnson, 667 F.3d 1359, 1363 (11th Cir.2012) (citing Stanley v. City of Dalton, Ga., 219 F.3d 1280, 1286 (11th Cir.2000)). “We review de novo the district court’s disposition of a summary judgment motion based on qualified immunity, resolving all issues of material fact in favor of Plaintiffs and then answering the legal question of whether Defendants are entitled to qualified immunity under that version of the facts.” West v. Tillman, 496 F.3d 1321, 1326 (11th Cir.2007) (citing Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir.2002)).
A.
As an initial matter, we address Mrs. Jackson’s efforts to contest the District Court’s finding that the Corrections officials were entitled to qualified immunity during the period of the hunger strike, without having taken a cross-appeal. In her papers, Mrs. Jackson attempts to argue that the portion of the District Court’s ruling that granted the Corrections officials summary judgment' on the basis of qualified immunity was error. In other words, Mrs. Jackson, despite her failure to cross-appeal, asks us to reconsider the District Court’s order, insofar as it held that the Corrections officials were entitled to qualified immunity while Mr. Jackson and the other inmates were not accepting food.
Because the cross-appeal rule “implicates our subject matter jurisdiction, [it] accordingly must be addressed as a threshold matter” prior to the merits of its underlying claims.[6] See Nat’l Parks Con *1239 servation Ass’n v. Norton, 324 F.3d 1229, 1242 (11th Cir.2003) (citing Juidice v. Vail, 430 U.S. 327, 331, 97 S.Ct. 1211, 1215, 51 L.Ed.2d 376 (1977)).
First, as noted, the Corrections officials’ right to take what would otherwise be an interlocutory appeal is clear. In qualified immunity cases, “[a] public official [sued in her individual capacity] may file an interlocutory appeal of the denial of qualified immunity where the disputed issue is whether the official’s conduct violated clearly established law.” Leslie v. Hancock Cnty. Bd. of Educ., 720 F.3d 1338, 1344 (11th Cir.2013) (alteration in original) (quoting Stanley, 219 F.3d at 1286) (internal quotation marks omitted).
Second, it is apparent that Mrs. Jackson could have filed a cross-appeal with respect to the District Court’s grant of qualified immunity. In the absence of an appeal by the Corrections officials, Mrs. Jackson would have had to wait until after the trial to contest the summary judgment order. Because they did appeal, however, Mrs. Jackson’s claims, with respect to qualified immunity, could be heard under our pendent appellate jurisdiction because “we ‘may • address [otherwise] nonappealable orders if they are inextricably intertwined with an appealable decision or if review of the former decision [is] necessary to ensure meaningful review of the latter.’” Hudson v. Hall, 231 F.3d 1289, 1294 (11th Cir.2000) (alterations in original) (citations omitted) (quoting Summit Med. Assocs., P.C. v. Pryor, 180 F.3d 1326, 1335 (11th Cir.1999)) (internal quotation marks omitted). Importantly, for a claim to fall within our pendent appellate jurisdiction, a party must file a cross-appeal of its own. See, e.g., id. at 1293-94; McQueen v. Johnson, 506 Fed.Appx. 909, 911, 913-14 (11th Cir.2013).
Here, Mrs. Jackson’s claims are sufficiently intertwined with the issue on appeal that she could have filed a cross-appeal to attack the District Court’s finding that the Corrections officials were entitled to qualified immunity. On appeal, the Corrections officials seek to extend the protections of qualified immunity to the period following the end of the hunger strike. For her part, Mrs. Jackson attempts to argue that qualified immunity should not have been granted to them at all. Thus, the Corrections officials’ appeal, challenging the denial of qualified immunity after the hunger strike ended, implicates the same facts and the same law that would be needed to decide whether the Corrections officials were entitled to qualified immunity in the first place. See, e.g., Hudson, 231 F.3d at 1293-94 (finding claims to be inextricably intertwined where a police officer appealed the district court’s denial of qualified immunity for his search of plaintiffs following a traffic stop, and the plaintiffs cross-appealed the district court’s grant of qualified immunity to the police officer for the initial traffic stop, “[b]e-cause the issues raised by [the plaintiffs’] cross-appeal [were] sufficiently related to and intertwined with [the police officer’s] appeal”).
Mrs. Jackson, however, did not cross-appeal and thus may not use the Corrections officials’ appeal to increase her rights. See El Paso Natural Gas Co. v. Neztsosie, 526 U.S. 473, 479, 119 S.Ct. 1430, 1434-35, 143 L.Ed.2d 635 (1999) (“Absent a cross-appeal, an appellee may ‘urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court,’ but may not ‘attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary.’ ” *1240 (quoting United States v. Am. Ry. Express Co., 265 U.S. 425, 435, 44 S.Ct. 560, 564, 68 L.Ed. 1087 (1924))).
Mrs. Jackson argues that the District Court erred in granting the Corrections officials qualified immunity during the hunger strike. Were she permitted to make this argument and were she to prevail, the result would both enlarge her rights and lessen those of the Corrections officials. Therefore, based on the cross-appeal rule, we may not entertain her arguments with respect to the District Court’s grant of qualified immunity to the Corrections officials during the hunger strike.
B.
As to the appeal of the Corrections officials themselves, “[qualified immunity offers complete protection [from suit] for ... public officials performing discretionary functions ‘insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.’ ” Sherrod, 667 F.3d at 1363 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). “In deciding about qualified immunity, we are considering what an objectively reasonable official must have known at the pertinent time and place ...” that the decision was made. Youmans v. Gagnon, 626 F.3d 557, 563 (11th Cir.2010).
Moreover, • “[w]here the facts assumed for summary judgment purposes in a case involving qualified immunity show mixed motives (lawful and unlawful motivations) and preexisting law does not dictate that the merits of the case must be decided in plaintiffs favor, the defendant is entitled to immunity.” Sherrod, 667 F.3d at 1364 (alteration in original) (quoting Foy v. Holston, 94 F.3d 1528, 1535 (11th Cir.1996)) (internal quotation marks omitted). The parties do not dispute that the Corrections officials were acting in a discretionary capacity when they sent the letters terminating Mrs. Jackson’s visitation privileges. In addition, the Corrections officials acknowledge that Mrs. Jackson engaged in protected speech and conduct when she spoke at the rallies, and do not question Mrs. Jackson’s claim that she suffered adverse action in the termination of her visitation with her husband.
Based on the record presented at summary judgment, the District Court found that, at the time that the letters were sent terminating Mrs. Jackson’s visitation privileges, the Corrections officials were entitled to the protections of qualified immunity because they had a lawful reason for terminating Mrs. Jackson’s visitation privileges, which was the motivation “at least in part” for their actions.
The District Court was correct in this conclusion. The facts of this case demonstrate that Mr. Jackson had a considerable amount of influence over the other inmates and considered himself, and was viewed by others, to be the leader of the hunger strike. The record also shows that, on July 6, Mr. Jackson and the other inmates accepted food, thus appearing to end their hunger strike. Mr. Jackson was visited by his wife over the succeeding weekend and he was the only one of the striking inmates to receive any visitors during that two-day period. Following these visits, Mr. Jackson and seven other inmates resumed the hunger strike. In addition, intelligence gathered, such as an intercepted telephone call of an inmate, suggested that Mrs. Jackson urged her husband to prolong the strike. The record further demonstrates that the Corrections officials were legitimately concerned that the strike might spread, about the disruption caused by the strike, and about the *1241 security and safety of staff and inmates.[7] Thus, the record supports the conclusion that the Corrections officials’ acts were motivated by lawful considerations when they terminated Mrs. Jackson’s visitation privileges.
The record also shows, however, that a reasonable jury could find that the Corrections officials were motivated to terminate Mrs. Jackson’s visitation privileges, at least in part, by a desire to retaliate against Mrs. Jackson for her involvement in the demonstrations about the prison’s conditions. That is, Mrs. Jackson’s demands for a meeting with the Department of Corrections commissioner, and her participation in a protest that had no permit, were also motivating factors for terminating her visitation privileges. Nonetheless, the law of this Circuit is that, where, as here, the facts assumed for summary judgment show both a lawful and unlawful motivation for the decision made by a government official, the official is entitled to qualified immunity. Foy, 94 F.3d at 1535. In other words, the mixed motive analysis examines whether reasonable officers could anticipate that their actions, based on both lawful and unlawful motives, would result in a violation of a clearly established law. Employing this analysis, the District Court found that the Corrections officials were “protected by qualified immunity for their actions during the period of time surrounding the hunger strike.”
With respect to the claim that the Corrections officials “continued to retaliate [against Mrs. Jackson] for her protected speech long after the hunger strike and any threat it posed had ended,” however, the District Court held that, once the strike-related disruption had subsided, the Corrections officials’ “asserted lawful basis for banning [Mrs. Jackson’s] visitation during the hunger strike vanished.” Put another way, the District Court found that, once the hunger strike ceased, it was a question for the jury whether the Corrections officials were motivated solely by a desire to control Mrs. Jackson’s freedom of speech.
The District Court should have granted the Corrections officials’ motion for summary judgment on Mrs. Jackson’s claims. Here, the Corrections officials made just one decision with respect to Mrs. Jackson’s visitation privileges, the decision found in the July 19, 2012 letters. With respect to this decision, the Corrections officials’ entitlement to the protections of qualified immunity should have been determined “at the time” that they sent the letters to Mr. and Mrs. Jackson. See Sherrod, 667 F.3d at 1364 (citing Stanley, 219 F.3d at 1294). This is the case even though the decision, like many decisions made by public officials, had consequences in the future.
The purpose for qualified immunity is to permit officials to act without fear of harassing litigation as long as they can reasonably anticipate before they act *1242 whether their conduct will expose them to liability. See Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir.2002) (citing Lee, 284 F.3d at 1194). Indeed, “[i]f objective observers cannot prediet-at the time the official acts-whether the act was lawful or not, and the answer must await full adjudication in a district court years in the future, the official deserves immunity from liability for civil damages.” Maddox v. Stephens, 727 F.3d 1109, 1120 (11th Cir.2013) (quoting Foy, 94 F.3d at 1534) (internal quotation marks omitted).
Thus, the entitlement to the protections of qualified immunity is judged based on the facts and the law present at the time that public officials make their decisions and does not take into account later facts or changes in the law. See, e.g., Messerschmidt v. Millender, — U.S. -, 132 S.Ct. 1235, 1245, 182 L.Ed.2d 47 (2012) (“[Wjhether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.” (alteration in original) (emphasis added) (quoting Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987)) (internal quotation marks omitted)); Pearson v. Callahan, 555 U.S. 223, 232, 129 S.Ct. 808, 816, 172 L.Ed.2d 565 (2009) (“[I]f the plaintiff has satisfied this first step,[8] the court must decide whether the right at issue was ‘clearly established’ at the time of defendant’s alleged misconduct.” (emphasis added) (quoting Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001))); Youmans, 626 F.3d at 563.[9] Therefore, the District Court erred in its characterization of the Corrections officials’ decision to terminate Mrs. Jackson’s visitation privileges as having “continued [to] den[y Mrs. Jackson] visitation long after the end of the hunger strike.” Rather, the record establishes that the decision to terminate[10] Mrs. Jackson’s visitation privileges was lawfully made when the letters were sent on July 19, 2012, and that the Corrections officials were therefore entitled to qualified immunity from suit for their decision.
Accordingly, the Corrections officials are entitled to qualified immunity for both the period during the hunger strike and for the period after the hunger strike ended.
III.
Based on this Court’s precedent, we hold that the District Court should have found that the Corrections officials were entitled to qualified immunity for the period after the hunger strike ended. Accordingly, to the extent that the District Court denied summary judgment, we reverse its *1243 order dated January 8, 2014, and remand to the District Court to enter judgment in the Corrections officials’ favor.
REVERSED AND REMANDED.

. The Special Management Unit includes six dormitories, each of which contains thirty-two single-inmate cells. The inmates housed in the Special Management Unit are all maximum security inmates.

. According to the Georgia Department of Corrections’ Standard Operating Procedure VH47-0002, an inmate is deemed to be on a hunger strike "after nine consecutive meals have been refused.” Pursuant to this procedure, "[ijnmates ... who are mentally competent have the right to refuse to eat or take in liquids.” The procedure outlines the measures that the Department of Corrections must follow in the event of a hunger strike. Specifically, once deemed to be on a hunger strike, an inmate must "be housed in a setting where *1235 the refusal or consumption of food can be observed and documented.” In addition to meals being continuously offered to a striking inmate, the inmate's "hydration and nutritional status [must] be assessed” regularly by a health care professional, and the inmate must “be weighed daily.” As a hunger strike progresses in length, physicians must “determine whether or not the facility is capable of providing an appropriate level of care to meet the inmate’s ... projected needs” and whether the inmate should “be transferred to another facility that can provide twenty-four hour medical observation and-response.” Medical observation of an inmate can be ended only if the inmate "declares the hunger strike is over” or if the inmate "starts taking food and is medically stable.”

. The Georgia Department of Corrections’ Standard Operating Procedure IIBO1-0005 provides that ”[v]isitation is a privilege for inmates and should not be considered a right.”

. The conditions about which Mrs. Jackson and others protested included allegations that the Department of Corrections failed to provide inmates, who were being held at the prison's Special Management Unit, with access to personal hygiene items, sufficient yard time, appropriate medical treatment, and a thirty-day review of their imprisonment in the Special Management Unit, all as required by Department policy.

. The letters did not state the duration or reason for the termination. This omission appears to be in violation of the Georgia Department of Corrections' Standard Operating Procedure IIB01-0005 and the Georgia Department of Corrections’ regulations, which require that such notifications state the reason for, and length of time for which, a name is removed from the authorized visitor list. The dissent indicates that the Corrections officials' decision to “permanently” revoke Mrs. Jackson’s visitation privileges was “not ... entitled to complete qualified immunity.” No source, however, is cited in support of the proposition that the decision itself, rather than the communication of the decision, violated clearly established law.

. Although the Supreme Court has refrained from holding whether the cross-appeal rule is " ‘jurisdictional,’ and therefore exceptionless, or a 'rule of practice,’ and thus potentially subject to judicially created exceptions,” Greenlaw v. United States, 554 U.S. 237, 245, 128 S.Ct. 2559, 2564, 171 L.Ed.2d 399 (2008), this Court, like many other courts of appeals, has found the rule to be jurisdictional. See Christiansen v. McRay, 380 Fed.Appx. 862, 863 (11th Cir.2010); Art Midwest Inc. v. Atl. Ltd. P’ship XII, 742 F.3d 206, 211 (5th Cir.2014); Zapata Indus. v. W.R. Grace & Co., Conn., 34 Fed.Appx. 688, 690 (Fed.Cir.2002); Montgomery v. Carter Cnty., Tenn., 226 F.3d 758, 770 (6th Cir.2000); Johnson v. Teamsters Local 559, 102 F.3d 21, 29 (1st Cir.1996); EF *1239 Operating Corp. v. Am. Bldgs., 993 F.2d 1046, 1049 (3d Cir.1993).

. The United States Supreme Court has acknowledged "that the judiciary is 'ill equipped' to deal with the difficult and delicate problems of prison management.” Thornburgh v. Abbott, 490 U.S. 401, 407-08, 109 S.Ct. 1874, 1878-79, 104 L.Ed.2d 459 (1989) (quoting Procunier v. Martinez, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974)). As a result, the "Court has afforded considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world.” Id. at 408, 109 S.Ct. at 1879 (citing Martinez, 416 U.S. at 404-05, 94 S.Ct. at 1807). Indeed, the Supreme Court has found that "[c]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves.” Bell v. Wolfish, 441 U.S. 520, 546-47, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979) (quoting Pell v. Procunier, 417 U.S. 817, 823, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974)) (internal quotation marks omitted).

.The Supreme Court has set forth a two-step inquiry to determine whether a defendant is entitled to qualified immunity. The Court has clarified, however, that these steps need not be analyzed sequentially. See Pearson, 555 U.S. at 236, 129 S.Ct. at 818. A court's qualified immunity analysis must determine (1) "whether ‘the facts alleged show the officer’s conduct. violated a constitutional right,' " and (2) "whether the right was clearly established” at the time of the defendant’s alleged misconduct. Id. at 232, 129 S.Ct. at 816 (quoting Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001)) (internal quotation marks omitted).

. The dissent questions the applicability of Pearson and Youmans to the facts of this case. We believe that these cases are on point because they find qualified immunity based on the law and facts at the time the public officials made the decisions in question and left the grant of qualified immunity in place despite later changes in the law.

. Mrs. Jackson omitted from her amended and second amended complaints a demand for any injunctive relief for restoration of her visitation privileges. Although injunctive relief had been sought in her original complaint, she now seeks only monetary damages.