# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-3495

_____

3M Company, a Delaware corporation; 3M Employees Welfare Benefits
Associates, a Minnesota corporation; Employee Retirement Income Plan of
Minnesota Mining and Manufacturing Company, a citizen of New York

*Plaintiffs - Appellants*

v.

National Union Fire Insurance Company of Pittsburgh, PA, a Pennsylvania
corporation; Great American Insurance Company, an Ohio corporation; St. Paul
Fire & Marine Insurance Company, a Connecticut corporation; Federal Insurance
Company, a New Jersey corporation; Zurich American Insurance Company, a New
York corporation

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: October 18, 2016
Filed: May 31, 2017

_____

Before LOKEN, SMITH,[1] and COLLOTON, Circuit Judges.

_____

---

[1]The Honorable Lavenski R. Smith became Chief Judge of the United States
Court of Appeals for the Eighth Circuit on March 11, 2017.

SMITH, Circuit Judge.

3M Company ("3M") incurred losses on a number of investments due to fraud perpetrated by its own investment advisors. 3M purchased a "Blanket Crime Policy" ("the Policy") issued by National Union Fire Insurance Company of Pittsburgh, PA, Great American Insurance Company, St. Paul Fire & Marine Insurance Company, Federal Insurance Company, and Zurich American Insurance Company (collectively, "the Insurers"). 3M claimed that it earned returns on investments that were subsequently lost due to its advisors' malfeasance. 3M filed an insurance claim to recover the loss of the returns. The Insurers denied the claim, and 3M filed suit in Minnesota state court, seeking a declaration that the Policy covered 3M's losses resulting from the theft of 3M's alleged earnings. The Insurers removed the case to federal court and filed for summary judgment. 3M filed a cross-motion for partial summary judgment. The district court[2] granted the Insurers' motion and denied 3M's motion, holding that the stolen earnings are not covered under 3M's insurance policy because "3M does not meet the conditions of coverage set forth in the 'ownership' provision" of the Policy. We affirm.

I. *Background*

In 1999, 3M began investing its employee-benefit-plan assets in WG Trading Company LP ("WG Trading"). 3M structured this investment as a limited-partnership interest in WG Trading. Stephen Walsh and Paul Greenwood founded and served as general managing partners of WG Trading and two related entities, Westridge Capital Management, Inc. ("Westridge") and WG Trading Investors, LP ("WG Investors"). Westridge provided marketing services for WG Trading, and WG Investors was a

[2]The Honorable Patrick J. Schiltz, United States District Judge for the District of Minnesota.

limited partner in WG Trading. WG Trading was regulated and audited, but WG Investors was not.

Eventually, 3M learned that Walsh and Greenwood fraudulently diverted hundreds of millions of dollars from WG Trading and WG Investors. Walsh and Greenwood ultimately pleaded guilty to federal criminal charges. The United States Commodity Futures Trading Commission and the Securities and Exchange Commission initiated civil lawsuits against Walsh, Greenwood, Westridge, WG Trading, WG Investors, and other related entities ("the defendants"). The United States District Court for the Southern District of New York seized the defendants' assets and placed the assets into receivership. The receiver distributed the assets among the defrauded claimants, including 3M, who recovered the capital contribution that it invested in WG Trading. Although 3M recovered its capital contribution, 3M contends that it should also be entitled to recover lost earnings from the investments that WG Trading made in legitimate investment products that produced legitimate earnings.

3M's employee-benefit plans are insured under Endorsement 3 of the Policy (the "ERISA Rider" provision). 3M sought coverage for the stolen earnings under the "Employee Dishonesty" provision, which (as amended by Endorsement 10) states:

1. Insuring Agreement 1, EMPLOYEE DISHONESTY, of the attached policy is hereby deleted in its entirety and replaced with the following:
   The [Insurers] shall be liable for direct losses of *Money, Securities* or *other property* caused by Theft or forgery by any Employee of any Insured acting alone or in collusion with others.

2. Section 3., DEFINITIONS, is hereby amended to include the following:

*Theft* means the unlawful taking of Money, Securities or other property to the deprivation of the Insured.

3. Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, limitations or provisions of the attached policy, except as above stated.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

Section 5 "OWNERSHIP OF PROPERTY; INTERESTS COVERED" defines "insured property," and (as amended by Endorsement 8) states:

The insured property may be owned by the Insured, or held by the Insured in any capacity whether or not the Insured is legally liable, or may be property as respects, which the Insured is legally liable [("ownership requirement of Endorsement 8")]. Client property may be owned by the Client, held by the Client in any capacity whether or not the Client is legally liable, or may be property as respects which the Client is legally liable; provided the Insured is legally liable for such property and it is included in the Insured's proof of loss, in which event the third paragraph of Section 8 is applicable.

3M argued that the ownership requirement of Endorsement 8 does not apply to coverage for theft of *other property* under the Employee Dishonesty provision because the ownership requirement only applies to *insured property*. Alternatively, 3M contended that it "owned" the lost earnings because it had a right to possess the earnings and courts interpret the ownership requirement broadly.

The district court concluded that the ownership requirement of Endorsement 8 "limits the coverage available under the 'Employee Dishonesty' provision." The court

rejected 3M's claim of ownership, holding that 3M's limited-partnership interest in WG Trading did not confer ownership over the lost earnings because "[u]p until the point at which earnings were distributed to the partners, the earnings of WG Trading were owned by WG Trading, and not by 3M or any of the other limited partners." 3M appeals, arguing that coverage under the Employee Dishonesty provision is not limited by an ownership requirement.

## II. *Discussion*

"Insurance disputes are particularly well suited for summary judgment because the proper construction of an insurance contract is always an issue of law for the court." *Modern Equip. Co. v. Cont'l W. Ins. Co.*, 355 F.3d 1125, 1128 (8th Cir. 2004). However, the rules of construction are inapplicable if an insurance contract is unambiguous. *Id.* "When the words of an insurance contract are unambiguous, the intent of the parties is determined by the language of the policy itself. If the terms of an insurance contract are clear, they are to be accorded their plain and ordinary meaning." *Id.* (citation omitted).

"Under Minnesota law, the initial burden of establishing coverage rests with the insured." *Grinnell Mut. Reinsurance Co. v. Villanueva*, 798 F.3d 1146, 1148 (8th Cir. 2015) (citing *Midwest Family Mut. Ins. Co. v. Wolters*, 831 N.W.2d 628, 636 (Minn. 2013)).[3] "When an insured establishes coverage, the burden shifts to the

---

[3] The Insurers removed this action to federal court under 28 U.S.C. § 1352, and the parties have treated Minnesota law as controlling. Thus, we will apply Minnesota law in interpreting this insurance contract. *See Ohio Sav. Bank v. Progressive Cas. Ins. Co.*, 521 F.3d 960, 962 (8th Cir. 2008) ("Like the district court, we will ignore what might be a complex choice of law analysis because the parties have not identified a relevant state law conflict and have relied primarily on Minnesota and Ohio law; ignoring the issue in these circumstances is consistent with Minnesota choice-of-law principles.").

insurer to prove the applicability of an exclusion." *Id.* (citing *Wolters*, 831 N.W.2d at 636). "'[U]nambiguous words [are] given their plain, ordinary, and popular meaning.' If the words are ambiguous, however, they are to be 'construed against the insurer according to the reasonable expectations of the insured.'" *Ritrama, Inc. v. HDI–Gerling Am. Ins. Co.*, 796 F.3d 962, 966 (8th Cir. 2015) (second alteration in original) (citation omitted) (quoting *Gen. Cas. Co. of Wis. v. Wozniak Travel, Inc.*, 762 N.W.2d 572, 575 (Minn. 2009)).

> "An ambiguity exists when a word or phrase in an insurance contract is reasonably subject to more than one interpretation." *Mut. Serv. Cas. Ins. Co. v. Wilson Twp.*, 603 N.W.2d 151, 153 (Minn. Ct. App. 1999). The absence of a definition in an insurance policy does not per se render a term ambiguous. *See League of Minn. Cities Ins. Trust v. City of Coon Rapids*, 446 N.W.2d 419, 422 (Minn. Ct. App. 1989); *see also Hawkeye–Sec. Ins. Co. v. Bunch*, 643 F.3d 646, 652 (8th Cir. 2011) ("We are also not persuaded that the lack of a definition of the word 'vehicle' in the uninsured and underinsured motorists sections renders them ambiguous."). "[W]here a term is not defined in an insurance policy but possesses a clear legal or common meaning that may be supplied by a court, the contract is not ambiguous." *Genesis Ins. Co. v. City of Council Bluffs*, 677 F.3d 806, 815 (8th Cir. 2012) (internal quotation marks omitted). "In deciding whether an ambiguity truly exists, however, a policy must be read as a whole." *Mut. Serv.*, 603 N.W.2d at 153. "The language must be considered within its context, and with common sense." *Id.* "If a phrase is subject to two interpretations, one reasonable and the other unreasonable in the context of the policy, the reasonable construction will control and no ambiguity exists." *Id.*

*Id.* at 969.

The Employee Dishonesty provision covers "direct losses of *Money, Securities* or *other property* caused by Theft or forgery." Although the terms "Money" and "Securities" are defined in the Policy, the Policy fails to define "other property" (or even "property"). Thus, the "clear legal or common meaning . . . may be supplied by [the] court." *See Ritrama*, 796 F.3d at 969 (quoting *Genesis Ins. Co.*, 677 F.3d at 815).

"Property" is defined "[c]ollectively, [as] the rights in a valued resource such as land, chattel, or an intangible. It is common to describe property as a 'bundle of rights.' These rights include the right to possess and use, the right to exclude, and the right to transfer." *Property*, *Black's Law Dictionary* (10th ed. 2014). Property and ownership are fundamentally inseparable under the law:

> "'Property (from the Lat. *proprius*, meaning belonging to one; one's own) signifies, in a strict sense, one's exclusive right of ownership of a thing.' In their strict meanings, therefore, the right of ownership and property are synonymous, each term signifying a bundle or collection of rights. In a secondary meaning, however, the term 'property' is applied to every kind of valuable right and interest that can be made the subject of ownership, and in this sense, since it is the subject of ownership, land is called property. The term, therefore, includes both real and personal property, and it is often thus expressly defined in statutes. The word 'property,' however, may have different meanings, under different circumstances, according to the manner in which it is used."

*Id.* (quoting William L. Burdick, *Handbook of the Law of Real Property* 2–3 (1914)). Thus, the term *other property* in the Employee Dishonesty provision necessarily denotes some form of ownership.

3M claims ownership of the earnings through its limited-partnership interest in WG Trading, which entitles 3M to a share of the profits of the limited partnership and the right to receive distributions of partnership assets. 3M contends that by using the term *other property* instead of *insured property*, coverage under the Employee Dishonesty provision does not require that such *other property* be *insured property*. Thus, 3M argues that coverage for *other property* under the Employee Dishonesty provision is not subject to the ownership requirement set forth in Endorsement 8 (which defines "insured property" as property "owned by [3M,] or held by [3M] in any capacity whether or not [3M] is legally liable, or may be property as respects, which [3M] is legally liable"). 3M reasons that because the Employee Dishonesty provision does not specify whose other property is covered, it must therefore cover 3M's share of the profits of the limited partnership and the right to receive distributions of partnership assets. This is unreasonable.

*Other property* "must be considered within its context, and with common sense. If a phrase is subject to two interpretations, one reasonable and the other unreasonable in the context of the policy, the reasonable construction will control and no ambiguity exists." *Ritrama*, 796 F.3d at 969 (citation omitted) (quoting *Mut. Serv.*, 603 N.W.2d at 153). Although the Employee Dishonesty provision does not expressly state whose *other property* is covered, it is entirely unreasonable to interpret the provision as extending coverage under the Policy to other property that is not insured property. Interpreting the Employee Dishonesty provision as extending to coverage to other property that is not insured property runs afoul of Endorsement 8, which details the property and interests that are covered under the Policy. Thus, when viewed within its context and with common sense, the only reasonable construction of the Employee Dishonesty provision limits coverage under the provision to insured property. Thus, we determine that the ownership requirement of Endorsement 8, which defines insured property, applies to the Employee Dishonesty provision.

-8-

Because we determine that the ownership requirement of Endorsement 8 applies to the Employee Dishonesty provision, we quickly address 3M's alternative arguments.[4] First, 3M argues its limited-partnership interest in WG Trading satisfies the ownership requirement of Endorsement 8. However, up until the point at which the earnings were distributed to the partners, the stolen earnings were property of WG Trading—not property of 3M. It is fundamental that property acquired with partnership funds is partnership property, and individual partners do not own partnership assets until the winding up of the partnership. *See Brindle v. Hiatt*, 42 F.2d 212, 213 (8th Cir. 1930) ("There can be no question that in partnership property there is no individual ownership until, at least, the partnership has ceased activity and all of the debts have been paid so that there remains nothing but a division of the property."); *see also In re Bernard L. Madoff Inv. Secs. LLC*, 708 F.3d 422, 427 (2d Cir. 2013) (noting that, under Delaware law, "the limited partnership interests sold by the Feeder Funds to investors . . . did not confer an ownership interest in money that the Feeder Funds ultimately invested in BLMIS"); *Cyrus v. Cyrus*, 64 N.W.2d 538, 543 (Minn. 1954) ("Unless the contrary intention appears, property acquired with partnership funds is partnership property." (quoting Minn. Stat. Ann. § 323.07)). Thus, 3M does not own the stolen earnings and cannot seek coverage for the earnings under the Policy.

Further, 3M claims it satisfies the ownership requirement because it "had ERISA fiduciary duties regarding the earnings such that the earnings were 'property,' and property 'as respects [to] which [3M] is legally liable' under Endorsement 8." (Alterations in original.) It also claims that "3M's limited partnership interests in WG

---

[4] 3M asserts that the lost earnings qualify as property "owned by [3M]" or property for "which [3M] is legally liable." Because 3M does not argue that the lost earnings were property "held by [3M] in any capacity," we need not address whether the lost earnings could satisfy this alternative form of insured property described in Endorsement 8.

Trading are 'equity interests' and . . . 'asset[s]' under the governing ERISA regulation." However, the ERISA regulation, 29 C.F.R. § 2510.3–101, does not alter general commercial property rights, but merely defines the nature and scope of the fiduciary duties owed to plan participants. *See* Final Regulation Relating to the Definition of Plan Assets, 51 Fed. Reg. 41262, 41262–63 (Nov. 13, 1986); *Sec. Inv'r Prot. Corp. v. Jacqueline Green Rollover Account*, Nos. 12 Civ. 1039 (DLC), 12 Civ. 1139 (DLC), 2012 WL 3042986, at *8–9 (S.D.N.Y. July 25, 2012). Thus, this does not affect the ownership nature of WG Trading's partnership assets.

## III. *Conclusion*

Finding that 3M's purported interest in the lost earnings does not satisfy the ownership requirement of Endorsement 8, we affirm the judgment of the district court and deny 3M's motion to strike portions of the Insurers' appellee brief as moot.

———————————————