# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

November 20, 2017

Lyle W. Cayce
Clerk

No. 16-20539

COOPER INDUSTRIES, LIMITED; COOPER US, INCORPORATED,

Plaintiffs-Appellants Cross-Appellees

v.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA,

Defendant-Appellee Cross-Appellant

Appeals from the United States District Court
for the Southern District of Texas

Before STEWART, Chief Judge, and KING and JONES, Circuit Judges.

KING, Circuit Judge:

Cooper Industries, Ltd., invested its pension-plan assets in what turned out to be a Ponzi scheme. It submitted a claim under a commercial-crime insurance policy underwritten by National Union Fire Insurance Company. National Union denied the claim, and Cooper sued. Both parties eventually moved for summary judgment. The district court subsequently entered a take-nothing judgment against Cooper. The court held that Cooper could not recover under its policy with National Union because the claimed loss occurred only after Cooper loaned its funds to the fraudsters, at which point Cooper did not

No. 16-20539

own either the earnings or the principal, as required under the policy. Cooper appealed, and National Union cross-appealed. We now AFFIRM the judgment of the district court.

## I.

## A.

In the late 1970s, Paul Greenwood and Stephen Walsh decided to go into business together and formed an investment company. One of their company's investments was in Westridge Capital Management, Inc. ("WCM"), a Delaware corporation. One of Walsh's former clients convinced Greenwood and Walsh to lend him money to start WCM in 1983. The former client owned 49 percent of WCM, and Greenwood and Walsh owned the remainder. The former client ran WCM from Santa Barbara, California, and began operating as a registered investment advisor in 1996. Greenwood and Walsh served as directors of WCM from their New York offices until they resigned from the WCM board in January 2000.

Greenwood and Walsh shuttered their first investment company in 1990 and formed WG Trading Company, L.P. ("WGTC"), a Delaware limited partnership. WGTC was a registered broker-dealer under the Securities Exchange Act of 1934 and a commodity pool under the Commodity Futures Trading Commission ("CFTC") regulations. Shortly after founding WGTC, Greenwood and Walsh established WG Trading Investors, L.P. ("WGTI"),[1] another Delaware limited partnership, as a conduit for investment in WGTC. WGTI was unregulated. Greenwood and Walsh intended to use these two entities to pursue equity index arbitrage, a strategy (as described in Greenwood's deposition[2]) we explain below.

---

[1] We refer to WCM, WGTC, and WGTI collectively as the "Westridge Entities."

[2] Greenwood's deposition is attached to Cooper's motion for partial summary judgment.

2

No. 16-20539

WCM and WGTC began a joint venture in 1995 to market an "enhanced equity index strategy." Greenwood and Walsh claimed that their strategy could offer higher returns than the indexes alone without a corresponding increase in risk. The strategy had an "alpha" portion and a "beta" portion. The beta portion was a small percentage of each investor's portfolio that WCM would invest in stock or bond index futures. WGTC then used the remaining funds for equity index arbitrage, which was the alpha portion of the investment strategy. WGTC would buy all of the stocks in an index (like the S&P 500) and sell futures against those stocks. This made sense as a trading opportunity when the price of the futures exceeded the price of the index.[3] The prices of the two assets must, by definition, converge at the expiration of the futures contract. By going short on (i.e., selling) the futures and long on (i.e., buying) the index, WGTC could (at least as Greenwood described the strategy) capture not only capital appreciation and dividends from the underlying stocks, but also the premium on the futures. WGTC used computers to monitor indexes for arbitrage opportunities. Greenwood called WGTC's strategy "a perfect hedge." Any increase in the price of the futures would theoretically be offset by a one-to-one increase in the value of the stocks. The strategy supposedly mimicked the rate of return on the index while providing extra income from the arbitrage.

Investors could invest in the alpha portion in one of two ways. First, they could buy into WGTC's limited partnership, which would invest the partnership funds and distribute any profits back to the limited partners.

---

[3] If, by contrast, the price of the index exceeded the price of the futures, WGTC would reverse the trade. It would take a long position in (i.e., buy) the futures, and a short position in (i.e., sell) the stocks. In doing so, however, it had to take into account that it would pay a premium to hold the futures and would not receive dividends from the underlying stocks. According to Greenwood, if WGTC could not find any price discrepancies, it would not execute trades.

3

No. 16-20539

Second, they could loan funds to WGTI (itself a limited partner in WGTC) in exchange for a promissory note. WGTI would invest the funds and use any profits to make payments on the notes. WGTI set the interest rate on the notes equal to the investment returns of WGTC. Whereas a limited partner in WGTC could potentially lose money if WGTC lost money, a holder of a promissory note from WGTI would simply receive no interest.

## B.

Cooper Industries, Ltd. (together with Cooper US, Inc., "Cooper"),[4] was a publicly-traded electrical-equipment supplier.[5] Cooper provided its employees with a pension plan, which was managed by Cooper's Pension Investment Committee (the "Committee"). The Committee had divided the plan assets into two funds: a bond fund and an equity fund. In 2002, the Westridge Entities presented a pitch to the Committee. Two years later, the Committee contracted with WCM to invest some of the equity- and bond-fund assets.

The contracts provided that WCM would be a fiduciary of the pension plans under the Employee Retirement Income Security Act of 1974 ("ERISA"). Pub. L. No. 93-406, 88 Stat. 829 (codified as amended in scattered sections of 26 and 29 U.S.C.). The Committee also entered into a side agreement with the Westridge Entities. WCM was to invest 15 percent of the equity-fund assets in S&P 500 futures through a JP Morgan trust account and the remaining 85 percent in a promissory note from WGTI. For the bond fund, WCM was to invest 5 percent of the assets in U.S. Treasury Bond futures through a different

---

[4] Cooper US, Inc. is a subsidiary of Cooper Industries, Ltd. and the sponsor of the employee benefit plans at issue in this litigation.

[5] *See Eaton Corporation plc Completes Acquisition of Cooper Industries to Form Premier Global Power Management Company*, Eaton (Nov. 30, 2012), http://www.eaton.com/Eaton/OurCompany/NewsEvents/NewsReleases/PCT_428107.

JP Morgan trust account and the remainder in another promissory note from WGTI.

Cooper ultimately invested more than $140 million of its equity-fund assets and $35 million of its bond-fund assets through the Westridge Entities. Cooper redeemed its equity-fund investments in May 2008. It recovered its roughly $140 million in principal, as well as about $42 million in gains. Of those gains, about $20.3 million came from the beta portion of the portfolio—i.e., the S&P 500 futures purchased with funds from the trust account. The remaining $21.8 million came from the alpha portion—i.e., WGTC's equity index arbitrage. Cooper did not redeem its $35-million bond-fund investment.

## C.

The stellar returns were illusory: Greenwood and Walsh were running a Ponzi scheme. The National Futures Association ("NFA") discovered the fraud during a February 2009 audit and suspended their membership. Later that month, the CFTC and the Securities and Exchange Commission ("SEC") filed an enforcement action in the U.S. District Court for the Southern District of New York. The court appointed a receiver to collect and liquidate any assets, and to determine how to distribute the assets among the victims.

The receiver found that WGTC and WGTI operated as a single entity with elements of a classic Ponzi scheme. The entities commingled funds and used fraudulent accounting practices to conceal their true financial condition from investors and regulators. They were financially inseparable; neither entity could have survived without financial support from the other. At the same time, WGTC and WGTI had generated substantial legitimate earnings through equity index arbitrage. From 1996 to 2008, WGTC and WGTI generated about $330.6 million of actual net earnings. But Greenwood and

No. 16-20539

Walsh had promised investors much more. They had reported earnings of about $981.7 million—$651 million more than they had actually earned.[6]

According to the receiver's report, in addition to reporting fictitious returns, Greenwood and Walsh also stole over $130 million from WGTI. They used that money to fund extravagant lifestyles. Greenwood, for instance, spent over $3 million on a collection of 1,348 teddy bears[7] and $32 million on a hunter pony[8] farm. The thefts only exacerbated the discrepancy between actual and reported returns by reducing the amount of money available for arbitrage. Greenwood and Walsh's fraud depended on a steady inflow of new money. If an investor wanted to withdraw funds, they would have to use other investors' principal and earnings in order to cover the shortfalls they created through misrepresentations and theft. In order to maintain a steady inflow of investors, Greenwood and Walsh lied to prospective investors, including Cooper, about WGTC's returns. Greenwood and Walsh ultimately pleaded guilty to securities fraud, commodities fraud, wire fraud, money laundering, and conspiracy.

After completing his investigation, the receiver submitted an initial distribution plan to the court. He proposed returning about 85 percent of each investor's net investment (i.e., contributions minus withdrawals) for a total first-round distribution of $815 million. These distributions excluded earnings and interest. In fact, the plan proposed clawing back any earnings that Greenwood and Walsh had paid to investors. The district court approved that plan on March 21, 2011.[9]

---

[6] When asked why he reported inflated returns, Greenwood responded, "Uh, greed."

[7] The receiver discovered that the most valuable bear in the collection was worth over $100,000.

[8] A hunter pony is a type of show horse.

[9] Several victims, not including Cooper, appealed the order approving the plan, which the Court of Appeals for the Second Circuit affirmed. *See Commodity Futures Trading Comm'n v. Walsh*, 712 F.3d 735, 738 (2d Cir. 2013).

No. 16-20539

By that point, Cooper had already received $140.1 million in principal from its equity-fund investment, as well $20.3 million in earnings from the beta portion of its portfolio (the index futures) and $21.8 million from the alpha portion of its portfolio (the arbitrage). As for the bond-fund investment, the court determined that Cooper's first pro rata distribution would be $29.9 million. However, the court allowed the receiver to withhold $21.8 million—the purported earnings Cooper actually received from the alpha portion of its equity-fund investment—and directed him to file a claw-back action for that amount. The receiver did so, and he eventually settled with Cooper, returning $9.8 million of what he withheld. Cooper has since received an additional $4.2 million in distributions. Although Cooper has revised its claim of loss several times, it now claims to have lost about $17.2 million, with $8.7 million of that loss attributable to the bond fund and $8.5 million attributable to the equity fund.[10] To date, Cooper has recovered all of the equity-fund principal and all but about $1.1 million of the bond-fund principal. In National Union's view, however, Cooper is a net winner because it still received more than it invested in the Westridge Entities.

**D.**

Cooper bought annual commercial-crime insurance policies (also known as fidelity bonds) from National Union Fire Insurance Company of Pittsburgh ("National Union") that provided coverage from October 1, 2003, until October 1, 2012. The policy relevant to this dispute began on October 1, 2008 (the "Policy"). As relevant here, it covered Cooper's employee-benefit plans (as

---

[10] Cooper's alleged loss is based on its expert's calculation of the "actual interest" Cooper should have received. We have no judgment as to the propriety or accuracy of these calculations and use the amounts merely to illustrate Cooper's allegations. The actual amount of loss is in dispute, a dispute we do not (and need not) resolve for the purpose of reviewing the ruling on the motions for summary judgment.

additional insureds) against various types of employee misconduct, including theft and fraud:

> We will pay for loss of or damage to "funds"[11] and "other property"[12] resulting directly from fraudulent or dishonest acts committed by an "employee", whether identified or not, acting alone or in collusion with other persons.

The Policy's definition of "employee" was broadened in two separate endorsements to ultimately include "[a]ll U.S., U.K. and Canadian Fiduciaries," as well as "[a] trustee, administrator, employee or manager, including any outside administrator or manager who is an independent contractor, of any Employee Welfare or Pension Benefit Plan(s)." Coverage was limited to property that Cooper "owned":

> The property covered under this policy is limited to property:
> (1) That you own or lease; or
> (2) That you hold for others whether or not you are legally liable for the loss of such property.

The Policy did not define two terms that are central to this appeal: "own" and "loss."

There were also several exclusions in the Policy, two of which are relevant here. The "Trading" exclusion barred coverage for any "[l]oss resulting from trading, whether in your name or in a genuine or fictitious account." The "Indirect Loss" exclusion barred coverage for any "[l]oss that is an indirect result of an 'occurrence' covered by this policy." The Policy provided illustrative examples of "indirect losses," including "[y]our inability to realize income that you would have realized had there been no loss of or damage to 'money,' 'securities' or 'other property'" and "[p]ayment of damages of any type for which

---

[11] The Policy defined "funds" as "'money' and 'securities'."

[12] The Policy defined "other property" as "any tangible property other than 'money' and 'securities' that has intrinsic value."

you are legally liable." The Policy also had a limit of $10 million per occurrence, with a deductible of $250,000.

Cooper notified National Union of a potential loss to its pension plan of about $35 million on May 8, 2009. On January 29, 2010, Cooper filed a proof of loss, estimating that it could ultimately experience a loss of between $15 million and $57 million. National Union's claims administrator denied Cooper's claim on March 9, 2012.

Two months later, Cooper sued National Union in the U.S. District Court for the Southern District of Texas. National Union moved for summary judgment, and Cooper moved for partial summary judgment. The district court granted both motions but entered a take-nothing judgment against Cooper. It granted National Union's motion for summary judgment on two grounds. First, the district court held that "Cooper did not 'own' its lost earnings within the meaning of the Policy." *Cooper Indus., Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh PA*, No. 4:12-CV-01591, 2016 WL 3405295, at *12 (S.D. Tex. June 21, 2016). Although a party that does not have legal title to property can still be a beneficial owner, the court "reject[ed] the notion that the parties intended the word 'own' in the Policy to include this concept of beneficial ownership." *Id.* at *13. The district court also held that Cooper suffered no "loss" under the Policy when it loaned funds to WGTI because it gave up ownership of the principal at the moment it made the loan. *See id.* at *14.

The district court also granted partial summary judgment to Cooper on several issues. The district court held that neither of the policy exclusions applied. The trading exclusion did not apply because "Cooper's losses were caused by theft, not market forces." *Id.* at *7. And the indirect loss exclusion did not apply because Cooper invested directly with the perpetrators of the fraud, even if Cooper did not invest in the specific entity they used to commit the fraud. *See id.* The district court also held that Cooper could recover lost

legitimate earnings because Greenwood and Walsh's fraud also generated substantial earnings. *See id.* at *8–9. Moreover, the court held that National Union was not entitled to credit Cooper's earnings on some investments against its losses on others. *See id.* at *8 & n.9. Finally, the Court concluded that WCM was liable for Greenwood and Walsh's fraud because it had entered into a joint venture with WGTC. *See id.* at *11.

Cooper appealed, and National Union cross-appealed.

## II.

Before we consider the substance of the parties' arguments, we must decide Cooper's motion to dismiss National Union's cross-appeal. Despite prevailing in the district court, National Union cross-appealed the portions of the district court's order granting Cooper's motion for partial summary judgment. Cooper argued that the cross-appeal was unnecessary and moved to dismiss. We agree and grant Cooper's motion.

It is "more than well-settled" that only an "aggrieved" party may appeal a judgment. *In re Sims*, 994 F.2d 210, 214 (5th Cir. 1993) (citing *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 333–34 (1980)). National Union argues that it is an aggrieved party because the district court's "order" rejected several of its arguments. National Union is conflating the district court's opinion (i.e., the order) with its judgment. Appellate courts review judgments, not opinions. *Jennings v. Stephens*, 135 S. Ct. 793, 799 (2015); *Ward v. Santa Fe Indep. Sch. Dist.*, 393 F.3d 599, 603–04 (5th Cir. 2004) (collecting cases). "A cross-appeal is generally not proper to challenge a subsidiary finding or conclusion when the ultimate judgment is favorable to the party cross-appealing." *Nat'l Union Fire Ins. Co. of Pittsburgh v. W. Lake Acad.*, 548 F.3d 8, 23 (1st Cir. 2008). There is nothing unfavorable to National Union in the district court's *judgment*. In fact, the district court even used National Union's proposed order and simply crossed out "[PROPOSED]" and stamped the date. Although even

a prevailing party must file a cross-appeal to seek a modification of a judgment, *see Ward*, 393 F.3d at 604, National Union seeks no such modification because it won dismissal of the action in its favor, as well as costs. To the extent that the district court rejected the arguments in National Union's cross-appeal, "an appellee may urge any ground available in support of a judgment even if that ground was . . . rejected by the trial court." *Castellano v. Fragozo*, 352 F.3d 939, 960 (5th Cir. 2003) (collecting cases); *see United States v. Raines*, 362 U.S. 17, 28 n.7 (1960).

National Union contends that it is seeking relief beyond mere affirmance of the judgment because the district court's conclusions on the offset and fraud-imputation issue could dictate how the case is presented to a jury if we reverse and remand.[13] National Union characterizes its appeals on these issues as "conditional" or "protective" cross-appeals, citing *ART Midwest Inc. v. Atlantic Ltd. P'ship XII*, 742 F.3d 206 (5th Cir. 2014). However, *ART Midwest* is entirely distinguishable. There, the plaintiffs brought fraud claims against the defendants and sought a declaratory judgment that they properly terminated their contract with the defendants. *See id.* at 209. The jury found in the plaintiffs' favor on the breach of contract claim but in the defendants' favor on the fraud claim. *See id.* The defendants appealed the jury's findings on their breach of contract claim, but the plaintiffs did not cross-appeal the fraud findings. *See id.* This court reversed and remanded for a second trial, which resulted in a jury verdict in the defendants' favor. *See id.* at 210. We then held that the plaintiffs could not appeal the dismissal of the fraud claims because they had not raised them in their first appeal. *See id.* at 212–13. The key difference between *ART Midwest* and this case is an adverse judgment. Here,

---

[13] National Union thus concedes (at least by implication) that presenting its arguments regarding the indirect and trading loss exclusions by way of cross-appeal is improper.

there is no adverse judgment against National Union, such that it might need to protect its rights—just some adverse reasoning. The *judgment* is a total victory for National Union.[14] Indeed, the district court entered National Union's proposed order verbatim.

National Union was required to raise these arguments to avoid forfeiture, *see, e.g.*, *Med. Ctr. Pharmacy v. Holder*, 634 F.3d 830, 834 (5th Cir. 2011), but it was not required to do so in a cross-appeal. Rather, it should have simply raised them as alternate grounds for affirmance in its opposition brief. This is not just formalism. "A cross-appeal filed for the sole purpose of advancing additional arguments in support of a judgment is 'worse than unnecessary', because it disrupts the briefing schedule, increases the number (and usually the length) of briefs, and tends to confuse the issues." *In re Sims*, 994 F.2d at 214 (quoting *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 439 (7th Cir. 1987)). We are not inclined to allow parties to make an end run around the briefing limits of the Federal Rules of Appellate Procedure and multiply the usually streamlined appellate briefing process by raising alternate grounds for affirmance through unnecessary cross-appeals. In this case, National Union's improper cross-appeal resulted in an over-length opposition brief and an additional reply (giving National Union over four thousand words of additional briefing).

"Because the district court's final judgment was in favor of National Union . . . , National Union's cross-appeal from this favorable judgment is not proper, and is dismissed." *W. Lake Acad.*, 548 F.3d at 23. We instead construe

---

[14] National Union's reliance on *Conwill v. Greenberg Traurig, L.L.P.*, is misplaced for the same reason. 448 F. App'x 434 (5th Cir. 2011) (per curiam). Although a party may appeal a judgment that "itself contains prejudicial language on issues immaterial to the disposition of the case," *id.* at 436–37, that rule has no relevance here. There is nothing adverse in the judgment itself.

No. 16-20539

National's Union's cross-appeal arguments as additional arguments in support of the judgment.

### III.

"We review a grant of summary judgment de novo, applying the same standard as the district court." *Vela v. City of Houston*, 276 F.3d 659, 666 (5th Cir. 2001). A court must enter summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* This means that a party cannot survive summary judgment with just "a scintilla of evidence" in its favor. *Id.* at 252. Although we view the evidence in the light most favorable to the non-movant, the non-movant must still "come forward with specific facts indicating a genuine issue for trial" and cannot merely rely on the allegations in the complaint. *Vela*, 276 F.3d at 666 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). The proper interpretation of an insurance policy is a question of law. *Royal Ins. Co. of Am. v. Hartford Underwriters Ins. Co.*, 391 F.3d 639, 641 (5th Cir. 2004). As a result, insurance disputes are often resolved on summary judgment. *3M Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 858 F.3d 561, 565 (8th Cir. 2017); *accord Martco Ltd. P'ship v. Wellons, Inc.*, 588 F.3d 864, 878 (5th Cir. 2009); *Snelling & Snelling, Inc. v. Fed. Ins. Co.*, 205 F. App'x 199, 201 (5th Cir. 2006) (per curiam).

No. 16-20539

## IV.

Jurisdiction in this case is based on diversity. Thus, Texas law governs our interpretation of the Policy.[15] *See RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010). Texas courts "interpret insurance policies . . . according to the rules of contract construction." *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). The primary objective in interpreting an insurance policy is to "ascertain and give effect to the parties' intent as expressed by the words they chose to effectuate their agreement." *RSUI Indem. Co. v. Lynd Co.*, 466 S.W.3d 113, 127 (Tex. 2015) (quoting *In re Deepwater Horizon*, 470 S.W.3d 452, 464 (Tex. 2015)). In doing so, we give those words "their ordinary and generally accepted meaning" unless the parties intended to "impart a technical or different meaning." *In re Deepwater Horizon*, 470 S.W.3d at 464. To determine the ordinary meaning of a term not defined in the contract, courts typically begin with the dictionary definition. *See, e.g.*, *Epps v. Fowler*, 351 S.W.3d 862, 866 (Tex. 2011) (collecting cases). They then consider the term's usage in other authorities, such as prior court decisions, statutes, and treatises. *See Evanston Ins. Co. v. Legacy of Life, Inc.*, 370 S.W.3d 377, 382–84 (Tex. 2012). If we find that the Policy is ambiguous (i.e., susceptible to two or more reasonable interpretations), we "must adopt the interpretation favoring the insured." *Tesoro Ref. & Mktg. Co., L.L.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 833 F.3d 470, 474 (5th Cir. 2016).

The parties raise five issues in this appeal. Cooper argues first that the district court erred when it concluded that Cooper did not "own" its lost

---

[15] In order to determine which law to apply to this dispute, we look to the choice-of-law rules of the forum state—here, Texas. *See Smith v. EMC Corp.*, 393 F.3d 590, 597 (5th Cir. 2004). National Union concedes that Texas law applies because it contends that there is no difference between Texas and Delaware law on any of the issues on appeal. *See SAVA Gumarska In Kemijska Industria D.D. v. Advanced Polymer Scis., Inc.*, 128 S.W.3d 304, 314 (Tex. App.—Dallas 2004, no pet.).

principal and interest. Second, Cooper argues that the district court should have held that it suffered a "loss" at the moment it bought the promissory notes. National Union contends that even if that were error, the district court erred by ruling that Cooper was not required to offset its bond-fund investment losses with its profits from the equity-fund investment. Third, National Union argues that the district court erroneously imputed Greenwood and Walsh's knowledge to WCM. And finally, in the fourth and fifth issues on appeal, National Union argues that the district court wrongly concluded that the Policy's indirect and trading loss exclusions did not apply. We ultimately conclude that Cooper suffered a "loss" only after it loaned the principal to Greenwood and Walsh and that Cooper did not "own" the funds when they were in the fraudsters' possession. Because those holdings are sufficient to preclude coverage, we need not consider the parties' remaining contentions. *Cf. Shamloo v. Miss. State Bd. of Trustees of Insts. of Higher Learning*, 620 F.2d 516, 524 (5th Cir. 1980) ("[C]ases are to be decided on the narrowest legal grounds available.").

## A.

Cooper argues on appeal that the district court erred when it concluded that Cooper did not "own" its lost principal and interest. The word "own," in Cooper's view, encompasses both legal and equitable ownership. It claims that this understanding of "own" is widespread throughout Texas law—in areas as diverse as criminal, tax, trust, forfeiture, takings, and insurance law. Importantly, Cooper does not contend that the parties intended to adopt a technical, legal meaning of "own"; rather equitable ownership is part of the common definition of "own," according to Cooper. Finally, Cooper maintains that there is a genuine dispute of material fact over whether it equitably owned the lost profits and principal.

No. 16-20539

The Policy clearly does not use "own" in such a broad sense. A common dictionary definition of the verbal form of "own" is to "[t]o have or possess property . . . to have control over." *Own*, The American Heritage Dictionary of the English Language (5th ed. 2011); *accord Own*, Merriam-Webster's Collegiate Dictionary (11th ed. 2007) (defining "own" as "to have or hold as property: POSSESS" or "to have power or mastery over"); *see also Own*, Black's Law Dictionary (10th ed. 2014) ("To rightfully have or possess as property; to have legal title to."). As one court noted, the defining features of "ownership" are "*possession, control,* and *dominion." Twichel v. MIC Gen. Ins. Corp.*, 676 N.W.2d 616, 622 (Mich. 2004) (citing various dictionaries). None of these dictionaries defines ownership in equitable terms, as Cooper does.[16] Cooper did not "own" the principal and earnings in the way most people would use that word. It loaned money to WGTI in exchange for promissory notes. When it made that loan, it gave up possession and control of the funds. Rather, it "owned" the notes, and the Westridge Entities "owned" the funds.

Even legal interpretations of "own" do not help Cooper's case. Courts have recognized that "own" can vary with the context. *Cf. Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003) (distinguishing "colloquial sense" of "ownership" from use of that term in corporate law); *Realty Tr. Co. v. Craddock*, 112 S.W.2d 440, 443 (Tex. 1938).[17] However, in insurance disputes, courts have generally used the common, everyday definition of the word "own." *See*

---

[16] Black's Law Dictionary does define an "equitable owner" as "[o]ne recognized in equity as the owner of something because use and title belong to that person, even though legal title may belong to someone else; esp., one for whom property is held in trust." *Equitable Owner*, Black's Law Dictionary (10th ed. 2014). However, it does not include "equitable ownership" in its definition of "own." *See Own*, Black's Law Dictionary (10th ed. 2014).

[17] "When we come to define the word or term owner, we find that it has no definite legal meaning. Strictly speaking, it is not a legal term. The meaning of the term owner is not the same under all circumstances. It is not a technical term or word at all, but one of wide application in various connections. In all instances its meaning must be ascertained from the context and subject matter." *Realty Tr. Co.*, 112 S.W.2d at 443.

16

*Republic Ins. Co. v. Luna*, 539 S.W.2d 69, 70 (Tex. Civ. App.—Beaumont 1975, writ ref'd n.r.e.). Cooper cites three Texas cases that it contends incorporate equitable ownership into the definition of "own." But none of these cases are relevant here. Each involved the sale of personal or real property, and each is consistent with the common understanding of "ownership"—i.e., the possession or control of property. *See Foust v. Old Am. Cnty. Mut. Fire Ins. Co.*, 977 S.W.2d 783, 788 (Tex. App.—Fort Worth 1998, no pet.) (holding that buyer of car who took possession and made payment was "owner" within meaning of contract); *Bucher v. Emp'rs Cas. Co.*, 409 S.W.2d 583, 586 (Tex. Civ. App.—Fort Worth 1966, no writ) (holding that buyer of property who took possession and made part payment was "owner" within meaning of contract); *Liverpool & London & Globe Ins. Co. v. Ricker*, 31 S.W. 248, 249, 250–51 (Tex. Civ. App.—Dallas 1895, writ ref'd) (holding that buyer of property who took possession and made part payment was "entire, sole, and unconditional owner" within meaning of insurance contract). Cooper has cited no case where a Texas court has held that a party continues to "own" funds it was fraudulently induced to loan to someone else.

Cooper also touts the cases it has identified in a number of other legal contexts—criminal, tax, trust, forfeiture, and takings laws—that recognize that the common meaning of "own" includes equitable ownership. That entirely misses the point. Just because courts have interpreted "own" in certain legal contexts to include equitable ownership does not mean that equitable ownership has been imported into the common definition of "own" as a result. The contract at issue here was between a Texas-based electrical-equipment supplier and a New York-based insurer. The subtleties of Texas takings law are not helpful in construing the meaning of an everyday or common word used in a contract not controlled by Texas takings law. *Cf. Nat'l Sur. Corp. v. Rauscher, Pierce & Co.*, 369 F.2d 572, 578 (5th Cir. 1966) ("We look on this as

do the businessmen to this contract."). The Policy is a standard form created (and copyrighted) by Insurance Office Services, Inc., not a unique contract that the parties negotiated anew. National Union sold fidelity bonds nationwide, including to other victims of Greenwood and Walsh. *See 3M Co.*, 858 F.3d at 563. It cannot have understood at the outset that the definition of an everyday word like "own" would depart from the common understanding of that term and instead turn on the subtleties of state criminal, tax, trust, forfeiture, or takings law.

The Eighth Circuit has likewise held that another victim of Greenwood and Walsh's fraud did not "own" funds invested through WGTC. *See 3M Co.*, 858 F.3d at 568. The insured there argued that it "owned" its principal and earnings as a limited partner of WGTC. *See id.* at 567. The court rejected that argument, holding that "up until the point at which the earnings were distributed to the partners," they remained property of WGTC. *Id.* at 567. Cooper attempts to distinguish *3M* because the insured did not argue that "own" included equitable ownership. We have already rejected that argument and, in doing so, interpret Cooper's policy not to cover property no longer in the insured's possession but given over to the Westridge Entities, much as the Eighth Circuit interpreted 3M's policy. Adopting Cooper's position would result in inconsistent interpretations of similar policy provisions—a result we strive to avoid. *See Lynch Props., Inc. v. Potomac Ins. Co. of Ill.*, 140 F.3d 622, 625 (5th Cir. 1998) (citing *Nat'l Union Fire Ins. Co. of Pittsburgh v. CBI Indus., Inc.*, 907 S.W.2d 517, 522 (Tex. 1995)).

Because we reject Cooper's argument that "own" includes equitable ownership in the Policy, we need not consider its arguments that it raised a genuine issue of material fact regarding equitable ownership of the principal and earnings. Cooper cannot establish, as a matter of law, that it "owned" either.

18

No. 16-20539

**B.**

Cooper also argues that the district court should have concluded that it suffered a "loss" under the Policy when it loaned the bond-fund principal to WGTI. According to Cooper, a "loss" occurs at the moment a borrower fraudulently induces a loan. Even if this is not the only interpretation of "loss," Cooper argues that it is at least a reasonable one that we are required to adopt. In response, National Union argues that a fraudulently induced loan is not void, but *voidable*. Ownership of the funds still passes to the borrower (WGTI here) because the loan might ultimately benefit the lender. As a result, Cooper did not suffer a "loss" when it was fraudulently induced to make the loan. Moreover, National Union argues that even if there was some loss, Cooper was required to offset the loss with the substantial profit it made on its equity-fund investment.

The Policy does not define the term "loss." In general, a "loss" under a fidelity bond requires "the actual depletion of bank funds caused by [an] employee's dishonest acts." *FDIC v. United Pac. Ins. Co.*, 20 F.3d 1070, 1080 (10th Cir. 1994). "Bookkeeping or theoretical losses, not accompanied by . . . pecuniary loss is not recoverable." *Id.* (first citing *Everhart v. Drake Mgmt., Inc.*, 627 F.2d 686, 691 (5th Cir. 1980); then citing *Fid. & Deposit Co. of Md. v. USAform Hail Pool, Inc.*, 463 F.2d 4, 6–7 (5th Cir. 1972)). To prove a "loss," then, an insured must show "some action which reduced the available assets in the hands of these employees as against its liabilities to depositors, creditors, and stockholders." *Cont'l Cas. Co. v. First Nat. Bank of Temple*, 116 F.2d 885, 887 (5th Cir. 1941).

Whether Cooper is entitled to recover the principal depends on whether a "loss" occurred before or after title passed to Greenwood and Walsh. Under Texas law, a fraudulently induced loan is voidable, not void. *See PSB, Inc. v. LIT Indus. Tex. Ltd. P'ship*, 216 S.W.3d 429, 433 (Tex. App.—Dallas 2006, no

19

pet.); *Harris v. Archer*, 134 S.W.3d 411, 427 (Tex. App.—Amarillo 2004, pet. denied). Even though Greenwood and Walsh procured the loan through fraud, title to the funds still passed to WGTI. *See BJ Servs. S.R.L. v. Great Am. Ins. Co.*, 539 F. App'x 545, 552 (5th Cir. 2013) (per curiam) (first citing *Akers v. Scofield*, 167 F.2d 718, 720 (5th Cir. 1948); then citing *Harris*, 134 S.W.3d at 427). The "loss," however, did not occur when Cooper loaned the funds to WGTI, but when Greenwood and Walsh stole them after the loan had been made. By that time, title had passed, and Cooper no longer owned the funds. Moreover, Cooper's substantial profit on its equity-fund investment belies any argument that it sustained a "loss" when it funded the loan. Cooper ultimately recovered all of its equity-fund principal, as well as roughly $30 million in earnings.[18] It makes no sense to say that it nonetheless suffered a "loss" of the principal when it funded the loan because the loan actually yielded a substantial profit for Cooper. Cooper may have ultimately earned less on the equity-fund investment than it would have had it invested with honest money managers, but that opportunity cost is a purely theoretical loss not covered by the Policy.

Cooper cites two cases in which courts have held that the loss resulted at the time of funding, but neither changes the outcome here. *United Pac. Ins. Co.*, 20 F.3d at 1080; *Portland Fed. Emps. Credit Union v. Cumis Ins. Soc'y, Inc.*, 894 F.2d 1101, 1105–06 (9th Cir. 1990) (per curiam).[19] Neither of these

---

[18] This amount includes the $20.3 million in earnings from the beta portion of the portfolio (the index futures) as well as the $9.8 million from the alpha portion of the portfolio (the arbitrage) that Cooper received in its settlement with the receiver.

[19] Cooper also cites *Universal Mortgage Corp. v. Württembergische Versicherung AG*, which merely noted that the insured "*may* have suffered an actual, direct loss when it funded [the] noncompliant loans." 651 F.3d 759, 763 (7th Cir. 2011) (emphasis added) (first citing *United Pac. Ins. Co.*, 20 F.3d at 1080; then citing *Portland Fed.*, 894 F.2d at 1105). The court concluded, however, that the insured "recouped that loss in full when it resold the noncompliant loans to investors" and was instead trying to recover for losses resulting from the investors' repurchase demands. *Id.*

cases applies Texas law, which controls the outcome here. *See RSR Corp.*, 612 F.3d at 857. In addition, *Portland Federal* is distinguishable because the fraudulently induced loan was secured by collateral of lesser value, resulting in an immediate loss. *See* 894 F.2d at 1105–06. And in *United Pacific Insurance Co.*, the insured bank's employee made an illegal loan in violation of an agreement between the insured and the Federal Reserve and concealed the loan from regulators. *See* 20 F.3d 1073–74. In that case, however, the FDIC as receiver discovered that "no payment was ever made on the loan[] and [the borrower] no longer exist[ed], making the loan uncollectible." *Id.* at 1079. That is distinguishable from the circumstances here, where the loss occurred not when the loan was funded, but later when Greenwood and Walsh stole Cooper's principal. *Cf. Universal Mortg. Corp. v. Württembergische Versicherung AG*, 651 F.3d 759, 763 (7th Cir. 2011) (holding that even if insured suffered loss when it funded fraudulent loans, it "recouped that loss in full when it resold the . . . loans to investors" and was actually trying to recover for later losses due to investor repurchase demands). Regardless of the outcome in *United Pacific Insurance Co.*, it would be anomalous to hold here that Cooper suffered a loss at the time of funding when it actually made a substantial profit on one of the loans.

Thus, under the Policy and the facts of this case, Cooper is not entitled to recover its principal investment because it did not suffer a "loss" of that principal until after title had passed to WGTI.

## C.

We need not consider the parties' remaining contentions because, regardless of how we resolve those issues, Cooper does not meet the requirements for coverage under the Policy. *Cf. Shamloo*, 620 F.2d at 524 ("[C]ases are to be decided on the narrowest legal grounds available.").

No. 16-20539

**V.**

For the foregoing reasons, we DISMISS National Union's cross-appeal and AFFIRM the judgment of the district court.